128 So.2d 80 (1961)
Mrs. Etturia LIDDELL
v.
NEW ORLEANS PUBLIC SERVICE, INC.
No. 21547.
Court of Appeal of Louisiana, Fourth Circuit.
February 20, 1961.
Rehearing Denied April 3, 1961.
Certiorari Denied May 12, 1961.
*81 Alvin R. Christovich, New Orleans, for defendant-appellant.
Sessions, Fishman, Rosenson & Snellings, Frank J. Stich, Jr., New Orleans, for plaintiff-appellee.
Before JANVIER, REGAN and SAMUEL, JJ.
SAMUEL, Judge.
Plaintiff instituted this suit against the New Orleans Public Service Co., Inc., for personal injuries and medical expenses incurred by her as a result of an automobile collision which she alleges was caused solely by the negligence of the defendant's bus driver. Defendant's answer denies negligence on the part of its driver, alleges that the accident was caused solely by the negligence of the plaintiff and, in the alternative, pleads contributory negligence. Charity Hospital has intervened praying for judgment in its favor against both plaintiff and defendant, in solido, for hospital treatment, etc., rendered to the plaintiff, together with attorney's fees.
There was judgment in the trial court in favor of the plaintiff and against the *82 defendant in the total amount of $17,574 ($17,500 for the injuries and $74 for certain medical expense) and in favor of Charity Hospital and against the defendant in the amount of $734.80 with 10% attorney's fees thereon. The defendant has appealed from this judgment and the plaintiff has answered the appeal praying for an increase in the amount of her award.
The testimony taken in the case is so long and conflicting that it will require considerable discussion. However, some of the facts are either uncontradicted or so firmly established that there cannot be any doubt about them, and these facts are:
The accident occurred on May 13, 1952, at approximately 6:15 p.m., on the Chef Menteur Highway near Laine Ave. in the City of New Orleans. This highway is a heavily traveled road and the principal traffic artery between New Orleans and the Gulf Coast. At the time of the accident it was still daylight, the weather was dry and visibility was good. At the point where the collision occurred the highway is 41' 6" in width, with a shoulder on each side, and is divided in the center by a blacktop or tar line 1' 2" in width. There are two 10' 1" lanes for traffic traveling east, and two lanes of the same dimension for traffic traveling west. The highway is straight for a long distance on each side of the point of collision. The vehicles involved in the accident were the defendant's bus, 33 feet in length, driven by the defendant's employee, and a 12 year old Buick automobile driven by the plaintiff.
The bus had reached the end of its regular passenger run and had stopped off the south side of the highway facing east. The plaintiff was driving east, that is, in the same direction in which the bus was facing, in her extreme south, or slow, lane. As she approached the bus the latter was driven from its parked position into, and proceeded north across, the highway for the purpose of making a "U" turn to its left in order to proceed back west towards New Orleans. At the point where the turn was made there is no intersecting or entering road of any kind.
The plaintiff car swerved to its left and its brakes were applied. It left 36 feet of skid marks beginning in its extreme right or south lane of the highway and continuing from that lane eastward and northward through the second lane reserved for fast east-bound traffic to the point of impact. The impact occurred about one foot on the north side of the center line of the highway when the right front of the car struck the bus behind the latter's left front wheel.
The legal speed limit in the accident area was 30 miles per hour.
On her case in chief the plaintiff called four lay witnesses, inclusive of herself, and one medical expert. On rebuttal she called four witnesses, also including herself. The defendant produced seven lay witnesses and one medical expert.
The plaintiff testified that she had passed one car about two blocks before the collision and immediately after such passing had returned to her extreme right lane, and was traveling at about 30 miles per hour. She noticed the bus parked on the shoulder to her right several feet off the highway when she was about 150 feet from the bus. The bus pulled out in front of her to make its "U" turn when she was about 50 or 60 feet away and continued across the highway without stopping, the bus driver not looking in her direction. She blew her horn, stepped on her brakes and swerved her car to the left in an attempt to avoid the collision. She was rendered unconscious by the impact and did not recover consciousness until in the hospital.
Plaintiff's second witness, Edward Mc-Callef, Jr., who was 18 years of age at the time of the accident and 25 years at the time of the trial, testified that:
He was walking along the highway with John Castrogiovanni, also a witness for the plaintiff, a short distance from the scene of the collision and facing in the direction of that scene, when the plaintiff car passed *83 him traveling in the slow or extreme righthand lane. The bus, which had been parked on the shoulder off the highway, pulled out to its left and into the lane occupied by the plaintiff when she was about 112 feet away and continued across the highway without stopping until the impact occurred. The bus driver did not look in the direction from which the plaintiff was coming and the bus made no effort to stop but continued across, increasing its speed. Plaintiff applied her brakes and swerved to her left, with both vehicles coming to a stop only after the collision. When he first testified on the subject of speed by the plaintiff this witness said she was traveling about 35, 40 or 45 miles an hour; later in his testimony he said her speed was 30, 35 or 40 miles per hour. In a statement given to the defendant three days after the accident he set plaintiff's speed at 55 or 60 miles per hour. In explaining the discrepancy between the testimony and the statement he said that at the time of the accident and statement he had been driving only about a year or two, whereas at the time of the trial he had been driving some eight and one-half or nine years, and that he gave his opinion on the trial with the benefit of this added experience and now felt that the latter was a better estimate of the speed.
Another plaintiff witness, John Castrogiovanni, whose testimony was taken by deposition, was 16 years of age at the time of the accident. His deposition states that:
As he was walking with McCallef along the highway facing in the direction away from New Orleans he heard the plaintiff car approaching and saw it pass a pick-up truck and get back into the slow lane of travel about a block before the accident. When first seen by him the plaintiff car was about 450 feet from the scene of the accident and 300 feet from him and its speed was about 35 miles per hour. The bus pulled out in front of the plaintiff when she was about 120 feet away and drove across the highway. The plaintiff applied her brakes when she was 30 or 40 feet from the bus, swerved to her left and the collision occurred. The bus driver was looking only in the direction of inbound traffic, that is, in the direction opposite from which the plaintiff was approaching. This witness had acquired some experience as a truck driver between the time of the accident and the occasion on which he made the deposition. In a statement given to the defendant shortly after the accident he had said that the plaintiff's speed was very fast and that he had remarked to his companion that he wondered when the police were going to catch her. When asked to explain this statement he said that the car was making some noise which he attributed now to a probable faulty muffler which gave the impression of greater speed and that his opinion, despite extensive cross-examination, was that plaintiff's speed was 35 miles per hour.
Plaintiff's next witness, Mrs. Marjory DeSilva, testified that she was driving on the highway in the same direction as the plaintiff when the latter passed her about two blocks from the accident and pulled over to the slow lane of travel. She followed the plaintiff car at a distance of about three car lengths and both cars were traveling at about 25 or 30 miles per hour. She saw the bus as it left the shoulder and pulled slowly across the road when the plaintiff was about 50 feet away. She heard the noise resulting from the application of the plaintiff's brakes and saw her car turn to the left before the collision occurred. She stopped at the scene and remained parked for a few minutes but, being in a pregnant condition and of the opinion that the plaintiff was dead, did not go to look. She left before the police arrived and did not leave her name with anyone. Several days after the accident she discovered the plaintiff's name by calling Charity Hospital and shortly thereafter, while at that hospital visiting another person, gave her name and address to the plaintiff's sister.
Bernard Furschzweig, the first witness called by the defendant, a member of the New Orleans Police Department who took pictures of the accident, testified that while *84 taking pictures he noticed that there was one beer bottle and a lady's shoe outside the car, and a few empty beer cans, a couple of beer bottles, some auto parts and a small amount of clothing inside the car.
The defendant's next witness, Elmo Altazan, testified that he was driving a pickup truck occupied by himself, his wife, and two children and proceeding on the highway in the same direction as the plaintiff when the latter passed him about two blocks from the scene of the accident traveling at a speed of about 60 miles per hour. In passing she crossed the center line of the highway forcing a car traveling in the opposite direction in its fast lane of travel, that is the lane closer to the center line of the highway, to go into the opposite fast lane in order to avoid a head-on collision. The plaintiff then returned to her proper side of the center line and proceeded, still at a high rate of speed, in a zigzag fashion. His speed was 30 to 35 miles per hour and he increased this speed to follow the plaintiff because, as he said to his wife, "that damn fool is going to kill somebody". There was no other vehicle between the plaintiff car and his truck. He first saw the bus when it was on the highway near the center line, moving very slowly and the plaintiff was about 400 feet away from the bus. Three or four seconds later the collision occurred. In answer to questions put to him by the trial judge this witness said that the bus traveled approximately 3 or 4 feet in the same period of time during which the plaintiff car traveled a distance of 400 feet. We cannot avoid making mention of the impossibility involved here. For if the bus was only traveling at a speed of 4 miles per hour (which the bus driver testified was his maximum speed in the turn) and considering the fact that the plaintiff applied her brakes and skidded some 36 feet, the plaintiff's speed would have had to be greatly over 100 miles per hour.
Mrs. Elmo Altazan, wife of the last named witness also testified for the defendant. She was in the front seat of the pick-up truck with her husband and the two children. The plaintiff's car passed their truck four or five bus stops from the scene of the accident and, in passing, went over into the fast lane of incoming traffic forcing a car traveling in the opposite direction on the fast incoming lane to swerve to its left to the fast outgoing lane in order to avoid a collision. The plaintiff's car went all the way over to, and struck, the north shoulder and then came back over to its proper side of the road. It ran across that side striking the south shoulder and then proceeded in a zigzag fashion. She sets the plaintiff's speed at "a terrific rate of speed" and her truck speed at 30 miles an hour until the plaintiff had passed at which time the truck increased its speed. She further testified:
"Q. All right. Then, after she passed you and after you speeded up did you see the Public Service bus? A. Well, when we rounded the corner there is a curve near there at Plum Orchard and we couldn't see the bus until we rounded the curve, and when we rounded the curve we saw the bus and it was on the highway and my husband said, `My Goodness', or something to that effect. `Honey, she's going to hit the bus' and I said, `No, she is too far from the bus, she can stop, or the bus will be completely gone with its curve,' and first thing you know, ker-plunkshe hit it."
She also testified that the plaintiff car was out of her sight after it had rounded the curve and until her truck did the same. She saw the bus for the first time when the bus was in motion and already blocking the outgoing lanes of travel with the front thereof a little across the middle of the highway. At that time the plaintiff car was about a block and a half away from the bus. Again we feel need of a comment. All of the evidence firmly establishes the fact that there was no curve in the highway and four or five bus stops from the scene of the accident would incompass a distance of considerably more than five blocks. In addition Mrs. Altazan's testimony is substantially the same as her husband's on *85 that point upon which comment was made above, that is, the bus traveled only a few feet while the plaintiff car was traveling 400 feet.
Floyd Green, employed as an investigator by the defendant, testified as a defense witness. He arrived on the scene after the vehicles had been moved and his testimony is concerned chiefly with matters which are not here in question. The one exception to this is his testimony to the effect that he observed skid marks of the plaintiff automobile for a distance of 36 feet and "tire marks", blending into these skid marks for a distance of 88 feet. The record contains no satisfactory explanation of what the witness means by "tire marks" nor of what such marks may indicate and we do not know the answer to either question.
The next defense witness was Fred Martin, who testified that he was standing with his brother on the east side of the highway and on the New Orleans side of the point of collision about 250 to 270 feet away therefrom. He said that he was waving a flag to stop an approaching Greyhound bus which his brother was going to catch for the purpose of going to Covington. His testimony is unsure and confusing, but he does say that he saw the collision and that he thought the plaintiff might have been traveling at a speed of about 50 miles per hour. He expressly stated that he would not swear to this estimate of speed and seemed to be unsure of the same, explaining that he had not driven a car for twenty years. His brother, who was waiting with him to board the bus to Covington, appears to have been in court during the trial but was not called as a witness.
The next defense witness was the driver of the defendant's bus. His testimony was as follows:
He had been employed by the defendant for many years and had been on this particular run for the past four months. He had pulled up to the terminus, where he had a five-minute stop, and parked the bus about 15 feet from the edge of the highway. After being there for five minutes he commenced the maneuver necessary to get the bus going back towards New Orleans. He drove to about two feet of the edge of the highway and looked towards the east over his left shoulder. He saw the plaintiff car approaching about two blocks away and then proceeded to make his crossing. After seeing the plaintiff car this one time he did not again look in the direction from which the car was approaching and did not again see that car. Looking in the opposite direction and across the road, he proceeded to make the "U" turn at a very slow rate of speed (a maximum of 4 miles per hour) because the bus was difficult to handle and required this slow rate.
Louis St. Amant, a bar tender, was the last defense witness. He had not seen the accident. He testified that he had been introduced to the plaintiff between 5 and 6 p.m. on the day of the accident by the plaintiff's friend, a Mrs. Gladgo, known to him as "Rosie". When asked whether or not the plaintiff was intoxicated, he answered that he could not say that she was intoxicated but that she fumbled with her car keys and talked with a thick tongue. He had not known the plaintiff before and had just been introduced to her by Rosie and he had known Rosie, who worked in a nearby bar, for some time.
The defendant also introduced testimony and photographs showing damage to the bus and severe, extensive damage to the plaintiff car, the latter being a total loss as a result of the collision.
Louis N. Huppenbauer, in the real estate business in New Orleans, was called in rebuttal by the plaintiff. He testified that he had business transactions with the plaintiff in his office on the day of the accident (at a time which would have been about four or five hours prior to the accident) and at that time she was her usual self and sober
*86 Peter Maurer was next called in rebuttal and his testimony was to the effect that he was an automobile mechanic and knew that the car driven by the plaintiff did not belong to her but to a third party, that the car was regularly used in the conduct of business, by himself and other persons working at the same place, to pick up spare parts and for various other purposes, that he probably put beer containers in the car or some of the others could have. He also testified that the car, although old, was in good condition.
The plaintiff herself again took the stand at this point and corroborated the testimony about the general use of the car by several people.
Mrs. Mary Rhodes Gladgo, the person referred to by the defense witness, St. Amant, as "Rosie", next testified in rebuttal. She had known the plaintiff for some 15 years and often went with her to the latter's camp at Lake Catherine. On the day of the accident the plaintiff had stopped to ask her to again go to the camp. She had declined the invitation and talked to the plaintiff for some time. This was the same occasion on which St. Amant had testified that he had met the plaintiff, but this witness denied such a meeting and stated that she did not know St. Amant. She also said that at the time of her conversation the plaintiff was "positively not under the influence of alcohol". They talked for quite some time after which the plaintiff left the place of their meeting, which was on the same highway on which the accident occurred, to go to her camp.
The court then allowed the defendant to again call its witness St. Amant and on this occasion he testified that he worked in a bar only a half a block from the place where Rosie worked and saw her frequently; that she came into his place and he would buy a drink and he would go into her place and buy drinks. He further said that shortly after he had seen the two ladies together Rosie came into his bar and told him that she was glad she had not gone with the plaintiff because the plaintiff had just been killed in an accident and that she, the plaintiff, had not been in any condition to drive.
Counsel for the plaintiff then attempted to place the plaintiff back on the stand. The trial judge refused to allow him to do so and, in connection with this refusal, said that he was sorry he had permitted the defendant to put St. Amant back on the stand after the defendant had rested, and that he had done so only because of a previous practice of the court. The trial judge further stated that if he continued to permit this procedure the case could go on forever and that, in any event, he was fully satisfied that St. Amant had not told the truth and that he, the judge, did not believe his testimony.
In view of all of the contradictory testimony, it is quite apparent that in order to arrive at a determination of the facts involved some of the witnesses must be believed and others disbelieved. This case is an excellent example of the need for the rule, so firmly established in our jurisprudence as to require no particular citation of authority, that on questions of fact involving the credibility of witnesses the trial judge will be reversed only for manifest error. See 2A La.Dig., Appeal & Error, We can find no such manifest error here and accordingly accept the finding of fact by the trial court.
The crucial fact involved was resolved by the trial judge in finding that the bus entered the highway, and the lane in which the plaintiff car was traveling, when that car was a distance of not more than 120 feet away.
It is incumbent upon the driver of a motor vehicle attempting to execute a left-hand turn on a public highway to make certain that it is safe to do so, to yield the right-of-way to approaching traffic, and to refrain from making the turn unless and until the way is clear. The burden rests heavily on the driver making *87 such a turn to show that he was free from negligence. LSA-R.S. 32:235, subd. A., 32:236, subd. A; Bouwell v. Marquette Casualty Co., La.App., 125 So.2d 168; Terrell v. Fargason, La.App., 67 So.2d 771; Codifer v. Occhipinti, La.App., 57 So.2d 697; Zurich Fire Ins. Co. of N.Y. v. Thomas, La.App., 49 So.2d 460.
Here the bus driver entered the highway at a time when it was unsafe for him to do so because of the proximity of the apporaching plaintiff car and there can be no question about the fact that he was negligent. In making a left-hand "U" turn across a heavily traveled highway without warning, at a point where there were no intersections or other roads and in the face of an oncoming automobile of whose presence he was aware but which he observed only once and did not even attempt to look at again (especially since in crossing the highway he effectively blocked off both eastbound traffic lanes), and in pulling out 120 feet in front of that oncoming car, it is very clear that he was not only negligent; he was grossly negligent and reckless.
The next question with which we concern ourselves is that of contributory negligence and since the trial judge obviously did not believe the testimony relative to the zigzag driving by the plaintiff from one side of the road to the other, the defense of contributory negligence must rest chiefly on intoxication and speed.
In civil cases involving traffic it is not necessary to show that the driver was drunk; it is enough to prove that he had a sufficient quantity of intoxicants to make him lose normal control of his mental and physical faculties and cause such faculties to be materially impaired. Otis v. New Orleans Public Service, Inc., La.App., 127 So.2d 197, and cases cited therein.
The only evidence offered by the defendant on the question of intoxication is the testimony of the photographer who discovered one beer bottle outside the car and a few empty beer cans and two beer bottles inside the car, and the testimony of St. Amant, the bartender. This testimony was effectively answered by plaintiff and two of her witnesses, Maurer and Gladgo.
The presence of these beer cans and bottles, in itself and even unexplained, is not proof of intoxication or drinking by the plaintiff. With the explanation as to the use of the car by other persons the presence of beer cans and bottles is proof of nothing at all. As for St. Amant (in addition to the fact that the trial court stated it did not believe this witness), he testified only to actions by the plaintiff which might, together with other things if present, indicate some drinking, but which in themselves are certainly not evidence of intoxication. Of greater importance is the fact that St. Amant, when asked the direct question, answered that he could not say that the plaintiff was intoxicated. And the witness Gladgo testified that the plaintiff was not "under the influence". When all of the testimony is considered we find that the defendant has not only failed to prove intoxication, or the drinking of intoxicants to an extent sufficient to affect the plaintiff's ability to drive safely, but that the preponderance of the evidence is to the effect that the plaintiff was not intoxicated and that her driving ability had not been affected by drinking.
It does not appear that the plaintiff's speed was excessive even though it may have been above the legal limit. We are not impressed by the only two possible sources of proof relative to that speed, i.e., the testimony of some of the witnesses, which testimony it is quite apparent the trial court did not believe, and the physical damage done to the bus and to the car as shown by testimony and photographs.
The testimony and photographs do show a tremendous amount of damage to the plaintiff automobile and considerable damage to the bus. But we are at a loss as to what this proves in connection with excessive speed by the automobile. There is no *88 testimony in the record, by qualified experts (if any such there be) or otherwise, from which we could draw any reliable conclusion as to what amount of speed is likely to cause what amount of damage. In order to cause the physical damage to the 12 year old automobile or to the bus, must the automobile have been traveling 30, 40, 50, 60 or more miles an hour? And how fast must the bus have been traveling? We do not know. It is possible that running into a bus of this size and apparent weight, especially one moving at an angle somewhat in the direction of the approaching car, could cause extensive damage even at a comparatively low speed.
The plaintiff's speed is important only if it is a proximate cause of the collision. For the fact that at the time of a collision an automobile was traveling at a speed greater than the limit set by law will not bar recovery if such speed was not a proximate cause of the accident. Bordelon v. Audubon Ins. Co., La.App., 116 So.2d 148; Edwards v. Walker, La.App., 97 So.2d 665; Michelli v. Rheem Mfg. Co., La.App., 34 So.2d 264; Great American Ins. Co. v. New Amsterdam Casualty Co., La.App., 15 So.2d 241.
In the instant case it has been established that the defendant's bus entered the highway, and the traffic lane in which the plaintiff car was traveling, when the car was not more than 120 feet away. This entry was made by the bus from its position off the highway to the plaintiff's right. It was not incumbent upon the plaintiff to anticipate or expect that the bus would suddenly enter and proceed across the highway without any warning whatever. For she had the right to assume that the bus driver would not violate the duty of care imposed upon him by law. See Alengi v. Hartford Accident & Indemity Co., La.App., 167 So. 130; Audubon Ins. Co. v. Levy, La.App., 73 So.2d 37.
Therefore the plaintiff was under no duty to constantly watch the bus or to observe its entry into the highway the instant such entry occurred. At the legal rate of 30 miles per hour her car would have been moving at about 44 feet per second. If she had been traveling at the legal speed and if she had not realized the existence of the peril for even so short a period as one and a half seconds, her car would have moved 66 feet and the distance to the bus would have been lessened to 54 feet, a distance too short to stop her car in sufficient time to avoid the collision, even assuming all pertinent conditions of car, road and driver to be excellent. Her speed was not a proximate cause of the accident.
We now arrive at the question of quantum. At the time of the accident the plaintiff apparently was between the ages of 48 and 56 (she was extremely reluctant to give information about her exact age). As a result of the accident she received the following injuries:
A concussion, deep lacerations of the forehead, and the possibility of a skull fracture; multiple rib fractures which healed in a deformed position; deep wounds to both buttocks; deep injuries across the upper abdomen and lower thoracic spine; fracture of the olecranon process of the left ulna, i.e., left elbow, necessitating immobilization by means of a cast and, twenty-three days after the accident, open reduction by surgical procedure and fixation with a screw; an almost complete tear of the infrapetellar ligament and probable chipped bone of the right knee, the torn ligament being repaired in the same surgical procedure as mvolved the fractured elbow; a badly lacerated left knee; and additional other contusions and lacerations. The screw remains in the elbow and the head of the screw projects some 20 mm. beyond the elbow bone, but the medical testimony is to the effect that no irritation is caused hereby and that therefore there is no present necessity for its removal. The plaintiff complains at length about the presence of the screw but has not seen fit to have it removed.
*89 In addition the plaintiff has the following scars, all permanent:
Several facial scars transversely over the lower part of the front of the forehead, that part directly above the nose being depressed three-sixteenths of an inch; an irregular transverse scar four inches in length, of purplish color and one-quarter inch average width, on the right knee; a longitudinal scar four inches in length just above that on the right knee; an irregular transverse scar four inches in length, purplish in color, and varying in width from one-quarter inch to three-quarter inch on the left knee; a fine operative scar on the left elbow, one-sixteenth of an inch in width and three inches long.
The plaintiff also suffered from a severe limitation in the cervical region (neck), described as a fused cervical spine. However, we are of the opinion that this condition was not caused by the collision but had existed prior thereto, although it is possible that the same was aggravated by the accident.
After the accident, and as a result thereof, the plaintiff was hospitalized continuously for a period of 79 days and she was an cut-patient for an additional period of about 4½ months. She has undergone a great deal of pain and suffering and still has some pain from the injuries she received. There is some limitation of motion and residual disability in the left elbow and right knee but neither is grossly disabling.
The trial court allowed the plaintiff the sum of $17,500 for the injuries she sustained, which amount the defendant alternatively contends is excessive and the plaintiff contends is inadequate. We are of the opinion that the amount awarded is excessive and reduce the same from $17,500 to $10,000.
For the reasons assigned the judgment appealed from is amended only insofar as to decrease the award in favor of the plaintiff for her injuries from the sum of $17,500 to the sum of $10,000. As thus amended, and in all other respects, the judgment is affirmed, plaintiff to pay the cost of this appeal, defendant to pay all other costs.
Amended and affirmed.
JANVIER, Judge (dissenting).
I am convinced that the sole cause of the accident from which this suit results was the gross negligence of plaintiff in driving at greatly excessive speed into the side of the slow-moving bus when it had almost crossed the highway. The record leaves me in not the slightest doubt.
I respectfully dissent.

On Application for Rehearing.
Rehearing denied.
JANVIER, Judge (dissenting).
A further study of this record impels me to the rather unusual action of giving reasons in writing for dissenting from the refusal to grant a rehearing. Ordinarily, having dissented from an opinion and decree rendered by my Associates, I am content to agree that a rehearing should be refused since usually it is obvious that a rehearing would produce no different result. However, the facts here as I see them, after a second study of this record and a viewing of the photographs, convince me that a miscarriage of justice will result if the decree is allowed to stand, and I cannot refrain from commenting on the facts which are made abundantly evident by the record.
In my original dissent I merely said that I felt that, regardless of any fault or lack of fault on the part of the operator of the bus, the negligence of the plaintiff was so apparent that she should not be permitted to recover.
I still feel that the operator was without fault and I particularly disagree with my Associates in their opinion that he should have continued to look to his left after he had commenced the "U" turn which was *90 necessary. Before starting that turn, he had looked to his left into the direction from which plaintiff was coming and had seen her car, which was then 600 feet or almost two blocks away and which posed no danger whatever if operated at anything resembling reasonable speed and with any care at all on the part of the driver.
Having committed the slow-moving bus to the "U" turn when it was perfectly safe for him to do so, the operator was fully justified in looking to his right to make sure that there was no vehicle coming from that direction which might create a hazard. The operator had not only commenced the "U" turn, but had almost reached the other side of the wide highway when the bus was struck near its front end and far beyond the center line of the highway and was struck at such high speed as to completely demolish the front end of the car and to cause considerable damage to the very heavy bus.
I shall not at length discuss all of the evidence, but shall merely refer to certain features which indicate obvious fabrications on the part of several of the plaintiff's witnesses and on the part of plaintiff herself.
While there is no positive evidence of intoxication on the part of plaintiff, except the testimony of one witness for defendant whose credibility was attacked, it is very interesting to note that in the car which she was driving the police found several empty bottles and beer cans.
While one of plaintiff's witnesses, Mrs. DeSilva, said that she saw the car of plaintiff just before the accident and that it was being driven at a slow speed of 25 to 28 miles per hour and that it had practically come to a stop when it hit the bus, the photographs show, as already stated, that its front end was practically demolished and that severe damage was sustained by the very heavy bus.
My Associates found it difficult to understand what was meant by one of the witnesses who said that skid marks made by plaintiff's car extended for 36 feet and started at the end of the tire marks, which showed that for 88 feet the car of plaintiff had swerved from its position on the far right side of the road towards and across the center of the road and had then skidded into the left front end of the bus which had almost crossed the highway. I think I understand perfectly what the witness said and I agree that the photographs confirm this statement and show that plaintiff must have realized the danger when her car was at least 124 feet from the bus, and that, had she been going at anything like reasonable speed, she could have easily avoided the accident. These photographs show that she attempted to swerve entirely across the road and to pass in front of the bus, and that, finding it impossible to do so, she struck it with tremendous force.
This witness, Mrs. DeSilva, tells an unbelievable story. She says that she had not known plaintiff before the accident; that she saw the accident, but did not give her name to anyone and that then, later by mere chance being in a hospital visiting someone else, she remembered the name of plaintiff and called on her and gave her name. This is hard to believe, but it is followed by another statement which I cannot accept. She says that from that time, for more than six years, no one called on her. She made no statement to anyone and did not even talk to one of the several attorneys, who at times represented the plaintiff, until about one week before the case was called for trial.
Another witness, Mrs. Gladgo, a close friend of plaintiff, according to Mr. St. Amant, a witness for the defendant, came to the barroom in which the said St. Amant was employed, and, after the accident, told him that she had been very lucky in that she was not in the car with plaintiff at the time of the accident. She said that she had not been in the car because, although plaintiff had invited her to get in and to go to plaintiff's camp with her, she realized that plaintiff was in no condition to drive and therefore refused to go
*91 Mrs. Gladgo denies that she made any such statement to the witness, St. Amant, and says that she did not know of him, and had never heard of him. This is unbelievable in view of the fact that she herself worked in another barroom very near to that in which St. Amant was employed and had worked near him in that similar establishment for some time.
St. Amant says that he knew Mrs. Gladgo well and that frequently he visited her in the barroom in which she worked and she visited him in his place of employment. I see no reason for doubting the veracity of St. Amant who did not know Mrs. Liddell, the plaintiff, and had no reason whatever to make the statement which he did. On the other hand, it is easy to understand that Mrs. Gladgo would deny her statement since she was a close friend of the plaintiff.
I direct attention to the statement of another witness for plaintiff, John Castrogiovanni, who stated that he had seen plaintiff's car shortly before the accident and had been impressed by the tremendous noise it was making. Realizing the damaging effect of this testimony on plaintiff's case, he attempted to explain what he meant was that the muffler was making a great deal of noise and that was why he said that he wondered when the police would stop her. The evidence shows that there was nothing whatever the matter with the muffler of the car.
The two other witnesses, Mr. and Mrs. Altazan, say that they saw the car driven by Mrs. Liddell just before the accident and noticed its tremendous speed, and that it was weaving from side to side, and Mrs. Altazan made the statement: "That damn fool is going to kill somebody."
I concede that the District Judge and my Associates must have disbelieved all of these witnesses, and I concede that only a question of fact is involved. And I realize that there is little, if any possibility, of preventing this obvious miscarriage of justice, but my realization of what I conceive to be my duty forces me to direct attention to these very obvious facts. Particularly I direct attention to the photographs and especially to those which show the tremendous damage sustained by the car and to those which show the skid and tire marks of the car. See photographs P.S. 2 and P. 11.
I respectfully dissent from the refusal to grant a rehearing.