REID, Judge.
The plaintiffs appellees, Employers’ Liability Assurance Corporation, Ltd., and its insured Wilson J. Melancon filed this suit against the Southern Farm Bureau Casualty Insurance Company for reimbursement for alleged collision damages in the amount of $697.10 sustained by the Melancon truck when it overturned at a point on Louisiana State Highway No. 1 just south of the community of Matthews, Louisiana between Raceland and Lockport, Louisiana.
Plaintiff Employers’ Liability Assurance Corp., Ltd., was the insurer of the Melan-con truck which was operated at that time by Donald Baudoin in the course of his employment by Melancon.
The Southern Farm Bureau ■ Casualty Insurance Co., was the liability insurer of one Pierre J. Champagne whose car, a 1963 Valiant Sedan was driven by Pierre Champagne’s son Ray Champagne. There was no collision between the two vehicles but *892 plaintiff claims that the Champagne vehicle parked on the right shoulder of the highway, both vehicles traveling in a southerly direction, and in the face of the approaching Melancon truck commenced a U-turn procedure, which forced the Melancon truck to swerve sharply to avoid a collision and causing it to overturn.
The Lower Court rendered judgment in favor of the plaintiff and against the defendant in the amount of $697.10 as prayed for, being allotted as follows: $447.10 to collision carrier, Employers’ Liability Assurance Corp., Ltd., and $250.00 to Wilson J. Melancon, the other plaintiff and insured for the amount of the deductible provision of his insurance policy, all with legal interest from date of judicial demand until paid and for all costs of Court.
From this judgment the defendant, Southern Farm Bureau Casualty Insurance Company, has prosecuted this suspensive and devolutive appeal.
The issues in this case are purely of fact. The defendant appellant assigned some six specifications of error which are mainly that the Court failed to give proper weight to the testimony of the investigating police officer and for relying mainly on the testimony of the driver of the appellee’s truck. They further complain that the Court erred in finding that the driver of appellant’s vehicle was at fault, and that his fault was the proximate cause of the accident, and in failing to find that the negligence and fault of the driver of appellee’s truck was the proximate cause of appellee’s damage, such as driving with improper brakes, driving at an excessive rate of speed, failing to keep his truck under control and failing to maintain the proper lookout. Further, they claimed that even if the driver of the appellant’s vehicle was guilty of negligence then the driver of appellee’s truck was guilty of contributory negligence such as to prohibit recovery, and in the last assignment they claimed that the Court erred in finding that the driver of appellee’s truck had the last clear chance to avoid the accident.
There were only four witnesses to testify in the case, namely, Donald Baudoin, the driver of plaintiff’s truck, Trooper Melvin A. Adams, Ray Champagne, the driver of the defendant insured truck, and his wife Mrs. Ray Champagne, who was not married to him at the time of the accident but who was in the car with him.
The Judge of the Lower Court dictated reasons for judgment and we think correctly sets out the facts in this case. We find that the statement of facts as found by him sets out the evidence so well that we are taking the liberty of quoting from them, herein as follows:
“In this case, the chief witnesses were the persons who were subject to the stresses and strain and excitement of the moment that necessarily arises when a situation of this kind develops. In this case, recollections depend upon impressions formed within the lapse of 3 or 4 seconds. Even at that, while there are differences, there are no real discrepancies.
Let us begin with Mr. Champagne’s testimony. He was driving down the highway accompanied by a young lady beside him in the front seat. As they drove along, they became aware that they had forgot to secure certain information before their departure, so they decided to go back for the information. Mr. Champagne testified that he pulled to the right shoulder of the road, came to a stop, looked around and saw nothing and so he started across the highway in a U-turn. He says that he saw the Baudoin truck when he crossed the center line and he doesn’t know how far away the truck was, but it was not far away. I must conclude, that when Mr. Champagne saw that the truck was not far away that it was only a short distance away from the Champagne car when the Champagne car crossed the center line of the highway. And that is the testimony of Mr. Champagne.
*893 If the Champagne car was stopped on the shoulder of the road and then undertook to make a turn across the road, it started from a dead stop and gradually worked its speed up. In other words, it started from zero speed and worked up after a certain distance to where it was going 5 miles an hour or 7\4 feet per second. Then it must have increased to 10 miles an hour, which would have been 14^ feet per second. I would have to assume that it increased further by the time it got to the complete crossing of perhaps 15 miles an hour, which is 22 feet per second. If you take all those distances and average them up, you will find that for the distance the average speed would have been about 14 feet per second starting from scratch. From the point of where the car started, which I will assume was a couple of feet off the highway on the shoulder, the crossing of the highway to a point a couple of feet on the shoulder, on the other side would have been a distance in a straight line of at least 24 feet. But the car had to circle to negotiate that distance, so it must have travelled at least 50 percent more distance in making the circle. So the crossing car had to travel a distance of at least 36 feet — from the time it left the shoulder on the right side of the road until the time that the front wheels got two feet off the shoulder of the other side of the road. When Mr. Champagne estimates a lapse of between 3 and 4 seconds between the time he started and the time his car was completely off the highway, we believe there must have been at least a lapse of 4 seconds.
From the point that Mr. Champagne started on the right shoulder of the highway to the point where he crosssed the center line (which is where he says he saw the approaching Baudoin truck) must have been a distance of 12 or 14 feet in a straight line, or an arc of about 20 or 21 feet, the distance the car actually trav-elled. The Champagne car having started at zero speed, its travelling time must have been at least 2]^ or 3 seconds from its starting point to the point where Mr. Champagne saw the approaching Baudoin truck. It is evident that time is an important consideration.
The testimony of Mr. Baudoin is that he was travelling along the highway in the direction of the Champagne car, and that when he was 75 to 100 or 150 feet away, the Champagne car started to cross the highway. He stated he saw the car ahead and the wheels evidently made a turn toward a crossing. He then pulled over a little into the left lane, which was his reaction to avoid a collision and to affect a passing. He evidently assumed, and we believe he was entitled to so assume, that the driver of the Champagne car was going to observe traffic rules that if there was oncoming traffic he was not going to undertake a hazardous crossing in the face of oncoming traffic; so Baudoin only hit his brakes lightly. Then when the Champagne car continued to make a crossing, he then applied his brakes heavily, which impresses me as a natural reaction. When the Champagne car continued to cross ahead of him, Baudoin then turned right, which was also a natural reaction until he hit the right shoulder of the highway. He then apparently made an effort to get back on the pavement and his turn was evidently a little too short because the car then turned over on the payment. The testimony is that the car came to a stop on its back with its four wheels up. We do not recall that there was any evidence that it made a complete turn over. Experience indicates that he should have continued to let his car roll along the shoulder until it came to a natural stop. The fact is that he first made a left turn and then a hurried right turn under stres/ and strain of the threat of an impending collision and he could hardly be held to be blameworthy if his reactions were not perfect since he had to act within a matter of seconds, possibly 3 seconds or less.
*894 There is testimony in the record indicating that the Champagne crossing took place in a straightaway at a point about 300 feet from a curve. The investigating officer found 70 feet of skid marks, presumably extending back from the point of crossing; and that the car overturned a short distance beyond that. It is contended the Baudoin truck was tavelling at a speed of 60 miles an hour, or possibly even more. If he was travel-ling 60 miles an hour he was moving at a rate of 88 feet per second. In 4 seconds he would have travelled 352 feet and should have been about 50 feet from the •end of the curve, and should have been visible to Champagne before he started to -cross. If he was travelling 50 miles per hour, a speed of 74 feet per second, he would have travelled 296 feet, and there was all the more reason to believe that he would have been visible to Champagne. If there were only 70 feet of skid marks .and no impact and the Baudoin truck travelled only a short distance thereafter "before overturning then, even if' we double the length of the skid marks, the Baudoin truck would have travelled only 140 feet from the point Baudoin applied his brakes heavily.
According to the Drivers Guide of the Department of Public Safety of the State ■of Louisiana, at a speed of 60 miles an hour reaction distance is 66 feet, braking distance is 185 feet, and total stopping distance 281 feet. The estimated distances given above indicate to us that the Baudoin truck could not possibly have been travelling as fast as 60 miles an hour, which was the legal speed in the .area as testified to by the investigating ■officer. Indeed, it is our belief that the truck could not have been travelling in •excess of 50 miles an hour. According to the Drivers Guide above mentioned, at that speed reaction distance is 55 feet, braking distance 128 feet and total stopping distance is 183 feet. These figures •clearly indicate to us that Baudoin was in view when Champagne started to cross the highway and should have been seen. There is a well established rule in’ the jurisprudence that to look and not see what one should see is equivalent to not looking at all. In this instance Mr. Champagne either did not look or he did not look carefully enough. It may be he was distracted by his company and their discussion of whether they should turn around and go back for information they did not secure before their departure. We are disposed to think that these thoughts were on their minds and distracted them; It is no justification for undertaking to make a crossing of a highway by a U-turn without making certain that such a crossing was safe before undertaking it.
It is our observation that Mr. Baudoin’s reactions in this case as set out above were normal and natural, and reasonable as one could possibly expect under the stress and strain of impending danger.
It is our view that Mr. Baudoin made every effort he could to avoid the collision and succeeded in doing so, and as a result of his diligence nobody was hurt. The only damage was to the truck. We believe that he reacted reasonably under the circumstances.”
We are in accord with this finding of fact by the Trial Judge. It is quite clear that appellant driver did not see the pickup truck but that he should have seen it because the highway was clear for a distance in excess of 300 feet. His financee riding with him did not see the pickup truck either.
The cases are too numerous to bother with citations here that a left hand maneuver across the main highway is one of the most dangerous maneuvers that a driver of an automobile can make. In this case we think that it was more negligent because he was attempting to make a U turn and maneuver. See Liddell v. New Orleans Public Service Inc., La.App., 128 So.2d 80; Audubon Insurance Co. v. Levy, 73 So.2d 37; LSA-R.S. 32:101, 32:104.
*895 There is no dispute about the quantum of damages and we find nothing manifestly erroneous in the decision of the Trial Court
For these reasons we find that the judgment of the Lower Court is correct and it is hereby affirmed.
Affirmed.