SARTAIN, Judge.
The plaintiffs in this action are Mr. and Mrs. Coy Dexter Booth who now appeal from a judgment of the district court which denied their respective claims for personal injuries and special damages growing out of an accident which occurred on May 28, 1965 in West Baton Rouge Parish on U. S. Highway 190.
The trial judge held that the accident was the result of the sole negligence of Mr. Booth who attempted to execute a “U” turn on a busy highway which created a sudden emergency that absolved the driver of a vehicle approaching from the rear of negligence. when the vehicle collided with plaintiffs’ vehicle. The record in this case clearly supports the findings of fact of the trial judge and his conclusions of law based thereon.
U. S. Highway 190 at the scene of the accident runs in an easterly-westerly direction and consists of four twelve foot lanes, with two lanes for each direction of travel. The highway is divided by a median strip approximately three feet wide and four *190 inches high. At various intervals there are breaks in the median strip. Paralleling the outside lane of each direction of travel is a shell or gravel shoulder of sufficient width to permit a vehicle to pull completely off of the pavement.
The accident occurred shortly before 5:00 P.M. o’clock at which time it was raining slightly and the highway was wet.
The vehicles involved were a 1964 Ford Station Wagon owned by Kansas City Southern Railway and operated by its employee, Mr. Coy Dexter Booth, who was returning to Shreveport from a business trip to New Orleans; and a Chevrolet pick-up truck owned by William J. Jenkins, d/b/a Jenkins Tile Company, Baton Rouge, Louisiana, and driven at the time by his employee, Murray C. Lucas. Plaintiffs sued Lucas, Jenkins, and the latter’s public liability insurer, Aetna Casualty & Surety Company.
Riding in the station wagon with Mr. Booth were Mr. John A. Reese who was occupying the right front seat and Mrs. Booth who was occupying the left rear seat. Riding with Mr. Lucas in the pick-up truck was David E. Literman.
Mr. Booth testified that shortly after crossing the Mississippi River Bridge at Baton Rouge he ran into a very heavy rain and that when he was about ten or twelve miles beyond the bridge he felt his vehicle start to weave. He was undecided as to whether or not it was because of the slick condition of the blacktop or some type of difficulty with his car. He then decided to pull his vehicle over to the shoulder to check his tires. When he did so he observed that his left rear tire was extremely low and he felt like it was necessary that he do something about it. He recalled passing a Texaco station when he passed Livonia, just a short distance back so he determined to continue west on the highway to a break in the median, execute a U-turn and proceed back to the Texaco station. He stated that when he got back in his car he rolled the glass down at the driver’s side to check traffic to his rear. He noticed a vehicle which he stated was a quarter of a mile or over 2,000 feet away. He testified that as he drove from the shoulder to the outside lane he activated his left turn indicator. He further estimated that it was necessary that he travel the distance of 150 feet from the place where he was parked on the shoulder of the road to the first break in the median; that he traveled 70 to 80 feet on the outside lane, then 40 to 50 feet on the inside lane before reaching the opening. Mr. Booth stated that his speed from the time he pulled from the shoulder of the road to the time that he stopped at the break in the median was between ten to fifteen miles per hour. He also stated that he did not look back to ascertain the position of the vehicle approaching from the rear after he had pulled into the inside lane preparatory to making a U-turn.
He then testified:
“Q And what did you do at that time?
A I made a left turn, an abrupt left turn.
Q Was this left turn from the left lane or the right lane ?
A From the lane next to the median.”
He further stated that before he could complete his turn he observed another car traveling in an easterly direction towards Baton Rouge so he had to stop in the break in the median for this oncoming car to pass. He stated that he was stopped from “four to five seconds” when his vehicle was struck from the rear by the pick-up truck. He admitted that the rear four or five feet of his vehicle remained in the inside lane for westbound traffic and that the front portion of his vehicle protruded into the inside lane for eastbound traffic. He explained that he had no indication at any time that he was going to be struck and received no warning.
Mrs. Booth stated that her husband pulled over to the shoulder of the road, got out of his vehicle, observed that the tire was *191 low and stated that they needed to return to the Texaco station. She said he got back into the car, rolled the glass down, checked traffic to his rear and then “angled across” the highway to reach the break in the median. She stated that it was her practice while riding as a guest to look to the rear to see if there was any approaching traffic. This she did and observed the approach of the pick-up truck which she stated was “quite aways back, * * * every bit of a quarter of a mile.” She called her husband’s attention to the truck and he acknowledged that he had already seen it. She stated that when her husband attempted to make his turn the station wagon was completely in the inside lane. She corroborated her husband’s testimony that it was necessary to stop in the break in the median because of a vehicle which was approaching from the west. She also stated that the station wagon had been stopped for “four or five seconds” when it was struck by the pick-up truck. She further corroborated her husband’s testimony by saying that throughout the maneuver from the shoulder to the break in the median the left turn indicator of the station wagon was in operation.
Mr. John A. Reese, the other passenger in the Booth vehicle, was deceased at the time of the trial.
Mr. Murray C. Lucas testified that he was driving his employer’s one-half ton pick-up truck on the inside lane in a westerly direction. The purpose of his trip was to deliver some marble to Dallas, Texas. He stated that he was traveling approximately fifty miles per hour and that he first noticed plaintiff’s vehicle from a distance of 200 yards when it was parked on the shoulder of the highway. He observed the vehicle pull on to the outside lane and stated that when he was approximately 150 feet from the station wagon it made an abrupt left hand turn in front of him. He stated that he did not initially apply his brakes very hard because he realized that the road was slick, that he was carrying a load of marble weighing 1200 to 1400 pounds and did not want to run the risk of losing control of his vehicle. He explained that “from the time I knew he (Booth) was making the left turn I didn’t have sufficient time in which to avoid hitting him”.
Mr. Lucas’ testimony is corroborated by that of the testimony of David E. Literman who in effect stated that the Booth vehicle drove from the shoulder of the road, across the outside lane to the inside lane and that he could see the vehicles were going to collide.
The police officer who investigated the accident stated that he found 25 feet of skid marks in the inside lane and that the pick-up truck traveled approximately 35 feet past the point of impact. His observation was that the skid marks extended just beyond the debris that was found on the pavement.
The photographs in the record indicate that the front center of the pick-up truck collided with the station wagon at the latter’s left rear near the gas filler cap. The damage to the vehicles as reflected by the photographs clearly shows that the Booth station wagon was in a near perpendicular position to the oncoming pick-up truck and that this is not a typical rear-end collision.
The record does not indicate that the pick-up truck was traveling at a fast or reckless rate of speed under the prevailing circumstances.
The trial judge correctly determined that the accident was the sole result of the negligence of Mr. Booth. The only conflicts in the two versions of how the accident occurred are the Booths’ assertion that the pick-up truck was at least one-quarter of a mile away when Booth pulled back onto the highway; whereas, Lucas stated that he was 150 feet away from the station wagon when he first observed that it was going to make a left turn; and, the Booths' testimony that the left rear indicator was in operation; whereas, Lucas doesn’t recall observing it.
*192 The trial judge rightly concluded that if the left turn indicator was operating, Booth’s action created an emergency that left Lucas helpless to do anything but attempt to bring his loaded vehicle to a halt.
These findings by the trial judge are entitled to great weight and should not be overturned by us, even if we were so inclined, except on a clear showing of manifest error on his part.
The jurisprudence of this state is replete with decisions setting forth the admonition that left turns or U-turns in motor vehicle traffic are the most dangerous maneuvers in which a motorist can indulge and that he must make sure that such a maneuver can be accomplished without danger to traffic to his left or rear. Employers’ Liability Assurance Corporation v. Southern F. B. C. Insurance Company, 191 So.2d 891 (1st La.App., 1966); Liddell v. New Orleans Public Service, Inc., 128 So.2d 80 (4th La.App., 1961); Audubon Insurance Company v. Levy, 73 So.2d 37 (Orl.App., 1954); LRS 32:101, 32:104.
Plaintiffs’ urge that Lucas was negligent in that he failed to heed their left •turn signal or to take necessary precautions so as to avoid the accident. The numerous authorities cited by plaintiffs correctly state the rule that a following motorist has a duty to keep his vehicle under control and to respect a forward vehicle’s announced intention to stop or turn. However, these authorities are not controlling here as the facts are inapposite. It was plaintiff-Booth who pulled from the shoulder to the outside lane, then to the inside lane and finally turned and stopped blocking a part of defendant’s lane of travel. All of this occurred within a distance of 150 feet. Mr. Booth should have remained either on the shoulder of the road or the outside lane until he was certain his switching of lanes, stopping and turning maneuver could be accomplished in safety. Mr. Booth was not privileged to change lanes on this multi-lane highway unless and until he had first ascertained he could do so safely. Zurich Insurance Company v. Grain Dealers Mutual Insurance Co., 169 So.2d 6 (2d La.App., 1964), LRS 32:79.
Finally, plaintiffs urge that Mr. Lucas had the last clear chance to avoid the accident and cite Evans v. Thorpe, 175 So.2d 418 (2d La.App., 1965); and, Palmisano v. Ryan, 136 So.2d 173 (4th La.App., 1962). In each of these cases the defendant had ample time to observe the dangerous maneuver of plaintiff and to have responded in such a way as to have avoided the accident. Therefore, the application of the doctrine of last clear chance was properly invoked. The facts in the cited cases are clearly distinguishable from those of the case .at bar. For here the trial judge found, and we agree, that Booth’s maneuver created an emergency that left Lucas with no opportunity to avoid the collision. See Myers v. Carolina Casualty Company, 167 So.2d 473 (4th La.App., 1964).
Accordingly, for the above and foregoing reasons the judgment of the district court rejecting both plaintiffs’ demands is affirmed at appellants’ costs.
Affirmed.