156 So.2d 98 (1963)
Lonnie C. ULMER et al., Plaintiff-Appellee,
v.
TRAVELERS INSURANCE COMPANY et al., Defendants-Appellants.
No. 5909.
Court of Appeal of Louisiana, First Circuit.
July 1, 1963.
Rehearing Denied September 26, 1963.
*99 Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, by Tom F. Phillips, Baton Rouge, for appellants.
Anthony J. Clesi, Jr., Baton Rouge, for appellees.
Before ELLIS, LOTTINGER, HERGET, LANDRY and REID, JJ.
ELLIS, Judge.
The defendants have appealed from a judgment in favor of the plaintiffs for property and personal injury damages awarded by the lower court after trial on the merits, as a result of an automobile accident.
On a clear Sunday afternoon, March 12th, 1961, at approximately 4:15 o'clock P.M., an accident occurred on Harding Boulevard, which is a state highway, at its intersection with Nottingham Street (A T intersection), *100 in the Parish of East Baton Rouge, Louisiana. The plaintiff, Lonnie C. Ulmer, accompanied by his wife, Mrs. Frances S. Ulmer, and his two children, Charlene and Cheri, was driving his small Renault automobile in a westerly direction on the highway and was being followed by his brother-in-law and his wife, Mr. and Mrs. Stewart, in the former's Plymouth automobile and to the rear of the latter car was a third automobile whose occupants are unknown, which was being followed by the defendant's car. The accident occurred as the plaintiff was making a left turn off Harding Boulevard into Nottingham Street, when his automobile was struck by the Goff car which was in the process of overtaking and passing the plaintiff's vehicle and the two other automobiles which were following plaintiff's car.
The highway at the point of the accident is 24 feet wide and the area where Nottingham Street intersects was described by the State Police Officer who investigated the accident as "more or less a semiresidential area. It is residential, but the houses don't set too close to the road. They set back off the highway." The speed limit was 60 miles per hour at this point on the highway. There is no proof that the defendant was exceeding the speed limit as it was estimated by various witnesses at 40 or 45 miles per hour and by the defendant at 50 miles per hour, just prior to the accident.
There is not much conflict in the main facts necessary to a decision in this case. The plaintiff Ulmer stated he did not give a hand signal but turned on the left turn signal on his Renault automobile when approximately 200 feet from the intersection and that just before he began his left turn he glanced over his left shoulder to look for passing traffic to his rear and seeing none began his turn and that just before he cleared the highway onto Nottingham Street he heard tires squealing and felt the impact of the collision to the left rear portion of his automobile, which caused it to turn around so that it was facing west in the southwest corner of the intersection against the south curb of the highway. Plaintiff Ulmer stated that he was approximately 50 feet when "* * * I glanced over my left shoulder, just before I went into the turn."
He heard the brakes of the defendant Goff's car before he was struck, at which time he stated he was about completely on Nottingham Street and that the Goff car could have "missed me." Mrs. Ulmer's testimony differs very little from that of her husband's.
Lonnie Stewart stated he was following the Ulmer automobile and that the left turn indicator light was turned on at about 200 feet from the intersection and that when the left turn had been practically completed and four-fifths of the Ulmer car was into Nottingham Street he saw the defendant Goff's automobile in the left or passing lane alongside of his car and heard the brakes when applied at about the same time. Mrs. Stewart testified to practically the same facts.
The defendant Goff stated he saw the three cars travelling closely ahead of him, quite slowly, so he started to pass, seeing nothing oncoming for quite a distance, and that he passed one of these cars and started to pull back in, "but I saw a free road, so I was going on around theI think it was a Plymouthand then this Renault, as I passed the second car and was very closely approaching the Renault, seeing no turn signals on any car, at that time, the Renault started into its left turn. I didn't blow my horn at the Plymouth or the Renault." He was positive in his testimony that he did not see any signals on the Renault nor on the Plymouth and that he was signal conscious. He also testified that when he pulled partially into the west bound right lane it was only possibly a couple of feet and that he was mainly still in the passing lane of the left lane, travelling west. He thought that he was at least "several feet ahead" of the Stewart car when he first observed the Ulmer car begin its left turn and "I was very closely approaching the Ulmer car." His automobile moved three *101 or four feet after the point of contact and the officer estimated that he was not going over 10 or 15 miles an hour at the time of the impact. Goff described the Nottingham Street intersection, not as a T intersection but as a side street on the state highway, that was quite obscure to the vision "when you are always away from that street. It was not visibly a very significant street." One of the police officers, who investigated the accident, testified that the Goff vehicle had made approximately 60 feet of skid marks all in the passing lane, and were straight. The diagram which the police officer made as a result of his investigation at the scene shows the point of impact well in the passing lane. The left front portion of the defendant Goff's automobile struck the left rear portion of the Renault. On cross examination he testified that the Ulmer car was damaged on a portion of the rear end and "the left portion of the left side and the rear end, and on the Goff car, it was. I think, most of his damage was in front or right at the front of his car" * * * "I think it would have been more to the left side, as I recall." This officer also stated that plaintiff Ulmer told him that he had started to give his signals for a left turn approximately 100 feet from the intersection.
We are satisfied from the testimony in this record that the plaintiff Ulmer was guilty of contributory negligence in failing to make a proper observation to his rear for passing traffic just prior to beginning his left turn, for at that time the defendant Goff's car was completely in the passing lane within clear and unobstructed view, had he really complied with the law and looked rather than merely glanced over his left shoulder. At that time defendant Goff's car was being operated within the speed limit and was too close for Ulmer to safely make a left turn and there is no doubt but that he would have so realized had he properly looked before turning, as the law directs.
We believe the law as cited and stated in the brief of counsel for the defendants is applicable under the facts of this case and controlling in so far as the contributory negligence of the plaintiff Ulmer is concerned and we quote:
"This case falls within the ambit of the recent decision of the Second Circuit Court of Appeal in Smith v. Massachusetts Bonding & Insurance Co., 130 So.2d 153 ([La.App.] 1961) and Davenport v. Salley Grocery Co., 147 So.2d 722 ([La.App.] 1962). It is axiomatic that under our law the person who attempts to make a left turn must ascertain before turning that the turn can be made safely without endangering overtaking traffic. Our courts have uniformly held that before making a left turn, a motorist must first ascertain by proper observation that the turn can be made in safety and where he fails to carefully survey his surroundings to ascertain whether traffic conditions warrant such a maneuver, he acts at his own peril and responsibility. In the event of an accident while engaged in such a maneuver and without exercise of such precaution, he is guilty of negligence. (Smith v. Massachusetts Bonding & Insurance Co. supra).
"In Jones v. Wilson, 239 La. 390, 118 So.2d 450 (1960), the Supreme Court held that a left-turning driver cannot discharge his burden by making his observation some distance from the intersection, but he is required to look to his rear immediately before attempting any turn across the center line of the highway."
The lower court, as well as counsel for the plaintiff, rely upon Hinton v. Beyl, La. App., 122 So.2d 680, and Faulkner v. Ryder Tank Lines, Inc., et al., La.App., 135 So.2d 494, in which writs were denied by the Supreme Court in February, 1962. We are in complete accord with the principles of law set forth in those two cases and the conclusion and result reached by the courts based upon the specific facts found in each case.
*102 In the Hinton case the court found as a fact that:
"At the time he commenced his turn, Beyl had every reason to believe the maneuver could be executed in safety without unduly impeding or interfering with any traffic proceeding at a lawful rate of speed within the range of his vision. He had looked ahead and determined the roadway was free of oncoming traffic. After his truck was passed by the Lincoln, he consulted his rear view mirror and observed that his own truck was the nearest following vehicle. At the time he glanced in his rear view mirror he did not and could not see plaintiff's station wagon because plaintiff was then behind the Prevost truck. Under such circumstances, it was reasonable for him to assume the turn could be made without impeding the progress of any overtaking vehicle proceeding at lawful speed. The situation presented in his rear view mirror would have indicated to any reasonable individual that the nearest visible vehicle would not be delayed or impeded by his proposed action. Under such circumstances he was not required, under penalty of being held actionably negligent, to anticipate that an unseen motorist overtaking the nearest visible vehicle would do so at such speed as to make his turn dangerous to himself and such other motorist."
The court in the Hinton case made an exhaustive review of the law all of which is applicable to any left hand turn case. It found particularly applicable to the facts in that case the following:
"`We are unable to accede to appellants' forceful argument that the left-turning driver is always barred from recovery when he proceeds to attempt a left turn, despite the presence of other traffic upon the highway. The left-turning driver is required to yield the right of way to and prohibited from attempting his turn unless the way is clear fromnot all approaching traffic, howsoever distant, butonly approaching traffic `which will be unduly delayed' by his turn, LSA-R.S. 32:235, subd. A. "The turning driver, after a proper signal for a left turn and observing nothing that would indicate his signal is not being obeyed, is entitled to assume that other drivers will obey the law and exercise reasonable care. Where he gives a proper signal, he is not required to pull off the highway to the right and wait for a vehicle, travelling in the same direction, to pass," 2 Blashfield, Automobile Law and Practice, 477, Section 1171.'
"(3) Applying the foregoing principles to the case at bar we find, as did the learned trial judge, that the instant case falls within the classification which absolves the left turning motorist of liability when the turn is attempted after proper signal and in the reasonable belief the maneuver may be safely executed without unduly impeding other traffic."
The facts in the present case are easily distinguishable from both of the above cited cases. The defendant Goff was travelling well within the speed limit on a state highway and had the plaintiff Ulmer made the observation which the law requires at the time it became actually necessary for him to begin his left turn he could not have failed to see the defendant Goff in the passing lane and realized, as every other normal driver would have done, that he intended to pass and was too close for Ulmer to make his left turn.
The law as set forth in the Faulkner case, supra, fully supports the conclusion which we have reached upon our findings of fact that the plaintiff Ulmer was guilty of contributory negligence in this case. In this case the court stated:
"(2) It is also well recognized that a motorist who desires to make a left turn on a city street is not required by *103 law to wait until there is no traffic in sight before attempting to do so. He has the unquestioned right to move after he has made a close and careful survey of traffic conditions about him and honestly believes, from such survey, that conditions warrant such action; he is entitled to rely upon the presumption that the other motorists in sight are observing and will continue to observe the speed regulations." (Emphasis added.)
Plaintiff Ulmer failed to make a close and careful survey of traffic conditions about him or he would and could have seen the defendant Goff in the act of passing and too close for him to believe that he could make the left turn without being struck. His failure to observe as the law requires was a substantial dereliction and was a direct factor that, without it, the accident would not have occurred.
We now pass to a consideration of the case of plaintiffs, Mrs. Ulmer and her two daughters, who were guest passengers in the Ulmer car. It is well settled that generally, a guest passenger is not required to keep a constant lookout for the dangers of the highway, or to pay attention to the ordinary road and other traffic conditions incident to automobile drivers, it being their right and privilege to place reasonable reliance upon the driver in charge of the car to exercise the necessary care and caution. Herget v. Saucier, 223 La. 938, 67 So. 2d 543. These guest passengers are entitled to recover from the defendant Goff if he was guilty of negligence which could be considered a proximate cause of the accident.
The accident in question having occurred on March 12th, 1961 is governed by the provisions of LSA-R.S. 32:233, Section E, which prohibits the driver of a vehicle, under any circumstances, of overtaking or passing another vehicle proceeding in the same direction at any railroad grade crossing or any intersection of the highway, unless permitted or instructed to do so by a duly authorized traffic or police officer. The language is mandatory and has been so held. In the present case the facts are clear that Nottingham Street intersected the highway upon which the parties involved in this accident were travelling. It is also clear from the evidence that the defendant was in the very act of violating this mandatory provision of the law in effect at that time. This provision of the law was repealed and superceded by No. 310 of 1962, which is now LSA-R.S. 32:73, but as the change is a substantive one it is not retroactive. It has consistently been held that one who violates this statutory traffic regulation by attempting to overtake or pass another motor vehicle at an intersection is guilty of negligence which, at least, contributes to the accident and is considered a proximate cause. See Herget v. Saucier, supra, and cases cited therein by Supreme Court of the State of Louisiana.
Having previously discussed the facts in our consideration of the plea of contributory negligence as to the suit of plaintiff Ulmer, the driver of the left-turning Renault automobile, we conclude, and so hold, under the facts, that the defendant Goff was guilty of negligence in violation of the mandatory prohibition expressed by our highway regulatory act in passing or attempting to pass at an intersection, although, Nottingham Street may be somewhat obscure at a distance, it is a blacktopped intersecting street that leads to a residential section and comes squarely under the prohibitory provision as interpreted by a long line of jurisprudence.
We believe Goff was also negligent in failing to see the indicator signalling a left turn on the plaintiff's Renault and accordingly sounding his horn and taking other precautionary measures to avert the accident. Under the facts of the case Goff was negligent in not seeing the turning light and taking all necessary action to warn plaintiff that he was in the process of passing and not to execute a left turn as indicated by his rear signal light.
*104 No one was seriously injured in this accident. The Ulmers were taken to the hospital after the accident and their family physician, Dr. Holden, was unable to come there and examine them, so he ordered x-rays and gave other instructions via telephone. The next day on the 13th of March, he examined Mrs. Ulmer in his office and his pertinent findings were "tenderness on palpation of the neck musculature, right shoulder and the right elbow. There was an increased muscle spasm and tenderness on flexion extension and rotation of the neck. However, the movement of the right shoulder and elbow elicited pain, but there was a full range of motion and I couldn't detect any fractures or dislocations at this time." Dr. Holden diagnosed Mrs. Ulmer's disability as a whiplash injury of her neck and a contusion of her right shoulder and right elbow. The x-rays showed no fractures, however, he saw her again on the 18th, 22nd and 25th of March. She continued to improve and was discharged on March 25th, 1961, and evidently her whiplash injury would be considered very mild and the award of $500.00 will not be disturbed.
Charlene Ulmer was six years old, at the time of the accident, and Dr. Holden, as a result of his physical examination found that she had contusions and "small hematoma of the left forehead." His diagnosis was a mild cerebral concussion. This child's main complaint was a severe headache when she visited the office the day after the accident with her family. It appears that Dr. Holden examined the whole family again on the 18th, the 20th, the 22nd, and 25th of March, except Cheri, aged two and one-half years. The lower court awarded $250.00 for Charlene's injuries, which we will not disturb.
The lower court awarded $350.00 on behalf of Cheri, whom Dr. Holden testified suffered no injuries whatsoever that he could find and made no complaints. Cheri Ulmer was referred to Dr. Smith, a psychiatrist in the City of New Orleans for examination on June 3rd, 1961, by her attorney in this case. She was examined again in August of 1961 by this doctor, who concluded that she showed symptoms and signs of anxiety, which he attributed to the accident. His conclusions were based largely upon the history given by her parents and also his observation that the child showed "infantile behavior", signs of anxiety by crying while in his office. The parents had told him that this child, after the accident, wet her bed at night and sucked her fingers. This doctor felt that Cheri had developed a fear, which although not overwhelming enough in a child to cripple her, possibly might be a "core of difficulty in the way of neurotic behavior or a neurosis that conceivably could develop in later years. It would be my main feeling that the child should be under some continued observation from time to time to see exactly what situation exists with her."
The Judge in his written reasons for judgment in favor of the father on behalf of Cheri stated:
"The child's psychiatrist, Dr. Smith, impressed the Court as being rather hesitant and uncertain himself that the accident in which this child was involved was positively the cause of the child's maladjustment, and apparently emotional disturbance at the time he examined her. Dr. Smith was kept on the stand for a considerable length of time and questioned extensively by counsel for both litigants and by the court and the court, though impressed with his professional ability, was also impressed by his evident uncertainty as to the cause of the child's emotional troubles."
From the record we do not believe that Cheri Ulmer was injured in the accident, nor that the evidence has fixed with the legal certainty that it required in all cases the responsibility for her so-called "infantile behavior" as being attributable to the accident. Dr. Smith was highly qualified and competent but we do not believe that an award can be made for a possibility that might never happen. Therefore the judgment of the District Court awarding *105 $350.00 to the father on behalf of Cheri Ulmer is set aside and annulled and reversed and the suit on her behalf is dismissed at the costs of Lonnie C. Ulmer.
Counsel for the defendants strenuously objects to the amount taxed as costs for the expert testimony given by Dr. Holden and Dr. Smith in the sum of $100.00 to each. We are of the opinion that Dr. Holden, who is from Baton Rouge would be adequately compensated by allowing $50.00 to be taxed as costs for his testimony. As to Dr. Smith, he is from New Orleans and presumably came to Baton Rouge to testify. We believe that the sum of $100.00 for Dr. Smith's testimony, taxed as costs, is reasonable under the circumstances.
Counsel for the defendants complained of Dr. Holden's bill of $335.00 from which the lower court correctly deducted $100.00 as it was frankly admitted was charged for four reports which he gave to the attorneys as a result of his examination of the Ulmers, leaving $235.00 which the lower court awarded to Lonnie Ulmer. Because of the contributory negligence of plaintiff, Lonnie Ulmer, he is barred from recovering individually for his personal injuries, property damage, and medical expenses on behalf of himself or his wife and child. See Ashey v. Kolb, La.App., 9 So. 2d 865, and Billiot v. Noble Drilling Corp., La.App., 102 So.2d 569.
For the above and foregoing reasons judgment in favor of Lonnie Ulmer for damages for personal injuries, property damage to his automobile, and medical costs is reversed, annulled and set aside and the suit dismissed at his costs.
It is further ordered that judgment of the court in favor of Lonnie Ulmer for and on behalf of his minor child, Cheri Ulmer, be annulled, reversed and set aside and that this suit be dismissed at his costs.
It is further ordered that the judgment in favor of Mrs. Ulmer and Charlene Ulmer be affirmed.
It is further ordered that the fee of Dr. Holden be reduced to the sum of $50.00. In all other respects the judgment of the district court will be affirmed, except as expressly set aside. It is ordered that all costs be divided equally between the plaintiff and the defendants.
Reversed in part and affirmed in part.