181 So.2d 784 (1965)
George D. TALLEY
v.
EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY et al.
No. 1904.
Court of Appeal of Louisiana, Fourth Circuit.
July 15, 1965.
On Rehearing January 10, 1966.
Writ Refused January 17, 1966.
*785 Frank J. D'Amico and Anthony J. Vesich, Jr., New Orleans, for plaintiff-appellee.
Schoemann, Gomes, Ducote & Collins, Rudolph R. Schoemann, New Orleans, for S. S. Seither d/b/a Modern Motor Transport Lines, and Emile J. Ruiz, defendants-appellees.
Bienvenu & Culver, P. A. Bienvenu, Hugh M. Glenn, Jr., New Orleans, for Employers Mut. Liability Ins. Co., Cecil C. Barnes and Southern Industrial Contractors, Inc., defendants-appellants.
Maurice Gomila, New Orleans, for Mrs. Joyce Lancaster Talley, intervenor-appellee.
Before McBRIDE, REGAN and YARRUT, JJ.
YARRUT, Judge.
Plaintiff seeks $211,275.50, plus interest and costs, for personal injuries suffered when a pick-up truck, in which he was a guest passenger of Defendant Cecil C. Barnes, crashed into the rear of a tractor-trailer truck parked on the highway, in charge of Emile J. Ruiz, an employee of Defendant S. S. Seither d/b/a Modern Motor Transport Lines. The latter, with its insurer, Marquette Casualty Company, are made Co-defendants with Ruiz.
The divorced wife of Plaintiff intervened claiming half of any recovery by Plaintiff, contending such recovery would be community property since Plaintiff's injuries were sustained before the divorce.
The district court rendered judgment only against Defendant Cecil C. Barnes and his employer, Industrial Contractors, Inc., and the latter's insurer, Employers Mutual Liability Ins. Co., in favor of Plaintiff and his intervenor wife, in solido, for $22,251.80, being the amount he considered belonged to the community up to the time of the judgment of separation from bed and board; and in favor of Plaintiff individually for *786 $10,000.00 for permanent disability to his lower lip and future loss of earnings, or total award of $32,351.80, with interest and costs.
Defendants Barnes, his employer, and the latter's liability insurer, have appealed for a reversal. Plaintiff answered for an increase of the award.
On the question of liability, the district judge held the accident was due solely and only to the negligence of Defendant Barnes in running into the rear end of the Ruiz truck, and absolved Ruiz, his employer and liability insurer from any responsibility therefor.
The collision occurred on February 6, 1959 at 6:30 p. m. Barnes was travelling south on the Airline Highway near LaPlace, Louisiana, when he crashed into Ruiz's truck parked on the right-hand lane of the two-lane roadway leading to New Orleans. The Airline Highway has two roadways, two lanes each for opposing traffic, the opposing roadways being separated by an elevated 5-ft. wide neutral ground strip.
The controlling issue on the question of liability is whether the parked truck, then under the control of Ruiz, was properly protected by the flare signals required by LSA-R.S. 32:441, reading:
"Motor busses and cars for hire having a capacity of over seven passengers, cars or trucks used as wreckers or for towing purposes, motor trucks and combinations thereof, operating on the highways between one half hour after sunset and one half hour before sunrise shall at all times be equipped with at least three portable flares, reflectors, or other similar devices which may be plainly visible for a distance of five hundred feet. The operator of such a vehicle shall immediately upon bringing his vehicle to a stop upon or immediately adjacent to the travelled portion of the highway, at any time during this period place one such warning device at the side of his vehicle just inside the black line marking the center of paved highways and near the center of dirt or gravelled highways, and place one such device approximately one hundred feet to the front and another one hundred feet to the rear of his vehicle, and shall maintain these devices in this position during the time the vehicle remains parked. Motor vehicles transporting explosives and inflammables shall be required to use tow flares, reflectors, or similar warning devices, to be placed as described heretofore, to the front and rear, but none adjacent to such vehicles."
We are satisfied the district judge concluded that the portable flares, required by the statute, were properly placed; in addition to which the Ruiz truck was well illuminated by many lights on the truck, as well as by the lights of a gasoline station located near the point of collision. Ruiz testified he placed three flares, one 10 feet in front; one 10 feet behind and another about 40 feet behind his truck.
One State Trooper, who arrived at the scene of the accident minutes after it occurred, from a nearby restaurant, testified he saw the lights of the trailer truck burning, as well as the lights of the rear trailer and the blinking turning signal. He found a one-foot high metal reflector on the roadway where Barnes' pick-up truck had run over it; that the pick-up truck made 30 feet of skid marks and knocked the trailer truck about 30 feet. Another State Trooper, who arrived shortly after, testified that all three reflectors were placed properly on the highway; that the truck was in the right-lane while the left-lane was completely open, and that Barnes admitted he had been drinking at a bar and he smelled of alcohol.
Defendants contend that Ruiz is solely responsible because he did not literally comply with the statute requiring that a flare be placed approximately 100 feet in the rear of any vehicle parked on *787 the highways. Our jurisprudence is to the effect that the flares, prescribed by statute, need only be placed so that an automobilist, properly observant, as he should be at all times, can see it; and that a minor violation of a regulatory statute is not negligence per se, but must have been a cause or a contributing cause of the accident. Piggly-Wiggly Operators' Warehouse, Inc. v. Commercial Union Insurance Co., La.App., 174 So.2d 207; Ardoin v. Williams, La.App., 108 So. 2d 817; August v. Delta Fire & Casualty Co., La.App., 79 So.2d 114; Howell v. Kansas City Southern Transport Co., La.App., 66 So.2d 646; Hollabaugh-Seale Funeral Home, Inc. v. Standard Accident Insurance Co., 215 La. 545, 41 So.2d 212; Williams v. Pelican Creamery, Inc., La.App., 30 So.2d 574.
What is a reasonable distance for the placing of such flares depends on the circumstances of each particular case, and the test has always been whether or not the flare or other warning signal required by the statute was a reasonable distance from the parked vehicle to permit an observant automobilist to see it, day or night.
Defendant Barnes testified he met Talley at the sugar plant in LaPlace, while Talley testified he couldn't find Barnes at the sugar plant but, knowing he was a frequenter of a neighborhood saloon, called there and found Barnes had been drinking. Each then had a couple of drinks together (Talley two beers and Barnes two highballs) before they embarked for New Orleans.
While the trial judge did not so state in his reasons for judgment, we feel that he, as we do, concluded Barnes must have been a little hazy due to his drinking, which impaired his vision and reactions. Another factor that impressed the trial judge as it does us, is several witnesses testified that many automobiles passed to the left of the stationary Ruiz truck without any mishap. If they could see it, then Barnes, had he been observant, should have seen it. This leads us to the question of quantum.
In fixing the quantum, the trial court in his reasons stated:
"The Court believes from the evidence that the plaintiff is entitled to a Judgment in solido with the intervenor for damages sustained up to February 4th, 1960.
"The Court finds that the community is entitled to loss of earnings in the sum of Thirty-five Hundred Forty Dollars ($3,540.00), hospital bill in the sum of Nine Hundred Twenty-three Dollars and Eighty cents ($923.80), medical bills in the sum of Ten Hundred Sixty-eight Dollars ($1,068.00), incidentals in the sum of Seventy ($70.00) Dollars, transportation expenses in the sum of Ninety ($90.00) Dollars, nursing fees in the sum of Fifteen Hundred Sixty ($1,560.00) Dollars, making a total of Seventy-two Hundred Fifty-one Dollars and Eighty cents ($7,251.80), and that the community is further entitled to recover for the personal injuries sustained between the date of the accident and February 4th of 1960 the sum of Fifteen Thousand Dollars ($15,000.00) making the total due the community the sum of Twenty-two Thousand Two Hundred Fifty-one Dollars and Eighty cents ($22,251.80).
"The Court further finds from the evidence that the plaintiff, George D. Tally, is entitled to the sum of Ten Thousand ($10,000.00) Dollars representing permanent disability to the lower lip, and future loss of earnings."
Damages recovered by a husband for personal injuries belong to the community, while such recovery by a wife forms part of her separate estate. LSA-C.C. arts. 2334, 2402.
Plaintiff was brought to the Ochsner Foundation Hospital shortly after the accident. Dr. Alton Ochsner, Jr., who examined and treated him, testified Plaintiff had *788 been severely injured but that his vital signs were normal, that is, his blood pressure, pulse and respiration; that, as he was bleeding profusely from his mouth and the blood might have entered his trachea, he immediately performed a tracheotomy during which Plaintiff was comatose, though conscious; had multiple lacerations of the scalp and face; an obvious fracture of his jaw; and a fracture of his right leg.
Dr. Thomas Lee Duncan, an orthopedist, treated Plaintiff for his fractured leg; Dr. James H. Quinn, an oral surgeon, for the fractures of the jaw; and Dr. Homer Kirgis, a neurosurgeon, for his scalp lacerations.
The following day (February 7, 1959) Plaintiff was in respiratory distress. It was found he had partial pneumothorax in both chests (collapse of lung) which was immediately treated by the insertion of a chest tube on each side. The condition was remedied and the tubes were withdrawn two days later on February 9, 1959.
Dr. Ochsner continued treating Plaintiff with antibiotics, intravenous fluids and something for pain until he was discharged from the hospital on February 17, 1959.
Plaintiff suffered the following injuries: a comminuted, but not compounded, fracture of the right tibia and fibula at the lower middle third of the right leg. The fracture was immobilized in a plaster cast. Plaintiff recovered completely from the fracture and was discharged by the attending orthopedic surgeon, Dr. Duncan, on September 12, 1959, with an impairment of function of the right leg of not more than 5%. The doctor testified it would not disable him from doing his regular work, and that he followed Plaintiff in the hospital after the accident until his discharge on February 17, 1959; and checked him thereafter from time to time; gave him a walking plaster cast, and finally discharged him, as cured, on September 12, 1959. The doctor did not see him again until December 18, 1964, when he found Plaintiff had completely recovered from the fracture, had no swelling or edema; had a 3/8 inch shortening of the right leg making it slightly smaller than the left leg; had full range of motion of his ankles and knees; walked well and got around quickly; and concluded that his leg had healed and was well from his injury, with a permanent impairment of function of about 5%, not enough to keep him from doing any kind of work.
Plaintiff also suffered fractures of the jaw bone on the lower left and right side, with lacerations both in the mouth and on the cheek, with bleeding in the mouth. While under general anesthesia, the lacerations of the face and mouth were closed with sutures and the fractures were positioned. The bones were wired together and the jaw kept immobilized for eight weeks. A wire loop was placed around two of his teeth which was eventually removed. He had a complete recovery from the fracture, and the occlusion of the teeth was adjusted until it was balanced throughout.
Dr. James H. Quinn, the oral surgeon, testified: Plaintiff's teeth were in a better condition after the accident than before; there was no residual loss of mandibular function as a result of the fractures; that prior to the accident he had lost a molar on both sides and a lower bicuspid tooth. Because of this condition the doctor advised Plaintiff he needed a bridge, and suggested he see a dentist. Plaintiff did not lose any teeth in the accident, and at the time of his discharge there was no mobility at the fracture site, and his occlusion was good.
When Dr. Quinn last saw Plaintiff on December 18, 1964, Plaintiff told him that he had not seen a dentist in almost five years; that Plaintiff had gingivitis, which results from bad hygiene; the same condition Plaintiff had before the accident for lack of proper oral hygiene.
Plaintiff claimed he lost two teeth after the accident and had them pulled by a Dr. Guidry. This doctor did not testify, and there is nothing in the record to establish *789 why he lost two teeth. It is interesting to note here that Plaintiff said: "I had all my teeth when I got hurt," but Dr. Quinn who saw him the night of the accident, testified he had at least three teeth then missing, not lost in the accident.
When Dr. Quinn last saw Plaintiff on December 18, 1964, the only residual he found was some numbness in the lower lip, on both sides, and a scar on the right side of his jaw which he said "I don't think it looks bad." Plaintiff complains that due to the permanent numbness of his jaw, he is unable to control his saliva and "drools."
Plaintiff also sustained a laceration of the scalp and of the face. The doctor cleansed the scalp and repaired the lacerations which cleared, leaving only insignificant scars. He thought Plaintiff might have had a cerebral contusion but, as an electroencephalogram was normal, he did not believe there was residual neurological deficit or symptoms from the accident.
The evidence further reflects, although Dr. Kirgis did not testify concerning same, that Plaintiff was re-admitted to Ochsner Foundation Hospital on May 2, 1959, where Dr. Kirgis performed a minor exploratory operation, under local anesthesia, but found no foreign body beneath the skin of his forehead. Plaintiff was discharged from the hospital on May 7, 1959.
After his discharge in September, 1959, Plaintiff returned to work for his regular employer, Dixie Machine & Welding Co., as a welder, and continued to work as such until May, 1960. During early May, 1960, he was welding in the forward deck of a ship which had carried sulphur. Anytime the arc struck, the sulphur would ignite causing fumes which "take your breath away and you have to get up to get air." That night, when he put water on his face, he found blood in his hands from his nose and mouth. He went to the hospital the next day, saw Dr. Ochsner again, and remained there under observation from May 4 to 14, 1960.
Dr. Ochsner examined him with Dr. Hatch, but found no abnormality. Plaintiff was complaining of shortness of breath and pain in the upper chest with spitting up of blood. Knowing that arc welding fumes and cigarette smoking irritate the lungs, the doctors recommended that he discontinue welding and smoking for the sake of his health; and that, as arc fumes irritate the lungs, it is considered an occupational disease of welders.
Plaintiff again went to the Ochsner Foundation Hospital on December 11, 1960 at which time he was found to have jaundiceinfectious hepatitis, a liver infection brought about by a virus, and was discharged on January 7, 1961. Plaintiff contends these ailments resulted from the accident.
Dr. Ochsner again examined Plaintiff on December 18, 1964, and found his chest was "essentially normal," and Plaintiff stated he had no hemoptysis (blood spitting) since he stopped smoking and welding.
With regard to the Plaintiff's third and fourth hospitalizations, i. e., his complaint in May, 1960, for hemoptysis and his hospitalization for hepatitis in December of 1960, the record shows that the former but not the latter was connected with the accident. When he was asked if the fourth hospitalization for hepatitis had anything to do with Plaintiff's previous lung and chest injuries, Dr. Ochsner said: "I don't think so. It is possible." However, when the court asked about the third hospitalization, the Doctor testified:
"Q Now, what I want to know is, is it your opinion that his trouble on May 4, 1960, was caused by the accident which he had on February 6, 1959?
"A Your Honor, it is a difficult question to answer because obviously these things can occur without such an accident, but it is my feeling that it might very well be related because he had a severe injury to his lungs and I had to do *790 a tracheostomy, which in itself interfers with the physiology of the trachea and lungsin other words, the clearing of secretions from the lungsand I feel it is very possible that these people on the one hand, are more susceptible to irritantstheir lungsif they had an injury; on the other hand he may even have had granulation tissue from previous injury to the lung and from which he had bled."
It is true that speculation, conjecture, mere possibility, and even unsupported probability are not sufficient to support a judgment. Crier v. Marquette Casualty Co., La.App., 159 So.2d 26; Ulmer v. Travelers Insurance Co., La.App., 156 So.2d 98; Smith v. Massachusetts Bonding & Insurance Co., La.App., 130 So.2d 153; Moore v. Employers Liability Assur. Co., La.App., 124 So.2d 804; Wilson v. Standard Accident Insurance Co., La.App., 92 So.2d 781; Henderson v. New Amsterdam Casualty Co., La.App., 80 So.2d 438; Pinkney v. Cahn Inv. Co., La.App., 32 So.2d 345. However, when one has suffered multiple injuries as Plaintiff did, and who had to undergo the oral and chest surgery described above, it is more probable than not, because of his weakened condition, that he became a ready prey to the subsequent attack of hemoptysis. Therefore, Plaintiff should have been compensated for his third hospitalization for hemoptysis.
His hospital bills amounting to $346.60, his other medical expenses of $241.00, plus his pain and suffering, should be awarded to him individually, since this hospitalization period occurred subsequent to the judgment of separation from bed and board on March 21, 1960. (Prior to Act No. 178 of 1962 a marital community was not dissolved until rendition of judgment for separation from bed and board. Now the community is dissolved as of the date of the filing of suit.) LSA-C.C. art. 155, as amended by La.Acts 1962, No. 178.
We find that the awards both to the community and to Plaintiff individually for personal injuries are correct; but that the special damages should be increased.
Although Plaintiff testified that he earned approximately $5,000 a year, his 1958 tax return filed jointly with his wife shows a combined income of about $5,700, which includes an undetermined amount earned by his wife, a secretary, who testified that she worked all during the marriage. It is therefore doubtful that the Plaintiff earned as much as $5,000 a year. However, if he earned between $5,000 and $5,700 a year, for eight months disability he would have lost wages of approximately the $3,540 allowed by the trial judge.
For his hospitalization expenses for the month of February he should recover $1,045.30 instead of $923.80, because the trial judge should have also allowed $121.50 for the second hospitalization (May 2 through May 7, 1959) for an exploratory operation to discover if there were any foreign substances imbedded in Plaintiff's head as a result of the accident.
Defendants contend that, where an individual receives multiple injuries in an accident, his pain, suffering, inconvenience and disability from the multiple injuries are considered together; and the award for damages should be less than it would be for awards to different individuals, each of whom sustain only one of the injuries suffered by Plaintiff. However, we cannot agree with this theory. Multiple injuries suffered by one must inevitably involve multiple suffering, inconveniences, and disabilities.
From the jurisprudence and the recent cases of Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 and Ballard v. National Indemnity Co. of Omaha, Neb., 246 La. 963, 169 So.2d 64, it is certain there can be no fixed mathematical formula for assessing damages for multiple injuries, *791 with their accompanying pain and suffering and duration. Each case must rest on its own particular facts. The amount awarded need not be the same, but not be too far above or below prior awards for comparable injuries.
We find that the $15,000.00 award to the community for Plaintiff's physical injuries is not manifestly excessive under the circumstances. As to the award to the husband, individually, we feel overall that $10,000.00 is correct, even though we feel some items allowed are incorrect. The trial judge made the award specifically for permanent injury to the Plaintiff's jaw and for future loss of income. We do not believe the Plaintiff, who now earns between $3,500 and $4,000 a year, proved loss of future wages because he did not prove what his annual income was prior to the accident, but only that he and his wife earned $5,700 a year jointly. However, the trial judge did not allow anything for pain and suffering for the third hospitalization, for the permanent shortening of Plaintiff's right leg or for permanent scars. In addition, we believe that the Plaintiff should recover $587.60 for medical and hospital expenses for the third hospitalization. Therefore the award to the community is increased to $22,373.30 and the award to the husband individually to $10,587.60. The judgment, thus amended, is affirmed; Defendants cast to pay all costs in both courts.
Judgment amended and affirmed.

ON REHEARING
Before McBRIDE, YARRUT, SAMUEL, CHASEZ and HALL, JJ.
CHASEZ, Judge.
A rehearing was granted in this cause limited to the question of expert medical fees. It appears from the record that a rule to tax costs which was brought by the plaintiff was indefinitely continued by the trial judge. The trial court has never passed on the question. Whether or not it is proper in this Court to assess costs, we feel, as a Court of review, that in this case we ought not to do so, and inasmuch as the rule below is still pending, the cause is remanded for trial thereon. Jansky v. Lucich, La.App., 159 So.2d 730.
Remanded.