YARRUT, Judge.
This is 'one of four companion suits (Nos. 1701, 1702, 1703, 1704), filed in the Civil District Court and consolidated for trial there, as well as for argument here on appeal, all decided on appeal this day, 172 So.2d 361, 362, 363.
The four suits result from an accident that occurred on May 12, 1962, at approximately 5:00 p.m. while the respective Plaintiffs were passengers in an automobile operated by one Dennis Boulmay on Fair-fax Court, also called Essex Place, approaching the intersection of Fairfax Court and Aurora Drive on the West Bank of the Mississippi River in Algiers (New Orleans) .
Plaintiffs were celebrating Mother’s Day. They had dinner at the house of the Cas- *358 trinos, and were en route to see new homes in Aurora Gardens and to visit the daughter of the Di Cortes, who lived close by.
The accident resulted when the automobile came to a sudden stop in the middle of the road at a manhole which extended 2 or 2j4 inches above the level of a small and shelled segment of the blacktopped road. The road involved was blacktopped except for this small segment, about 40 feet long, which was covered with loose shells, the manhole being located about 10 feet from the blacktopping on one side and about 30 feet on the other.
The respective Plaintiffs allege their injuries were due to the joint and concurrent negligence of the Sewerage and Water Board and the City of New Orleans (referred to hereinafter as “City” and “Water Board”) in the following respects: (1) in allowing a patently dangerous and defective condition to exist in the roadway of a public street; (2) in failing to take remedial action within a reasonable time when the City and/or the Water Board knew, or should have known, about this defective condition; (3) in failing to post warning signs or barriers; (4) in failing to maintain in a proper state of repair the street and the manhole of the sewerage line system; (5) in allowing a defective condition to exist in the ‘Street when the City and/or Water Board knew, or should have known, about the said defective condition; (6) in failing to keep the street properly leveled and graded; (7) in not building the street up to the level where it was safe to proceed ; or, alternatively, in not lowering the level of the said manhole to the level of the street where it was safe to proceed.
In the alternative, Plaintiffs charged that the accident was due not only to the joint negligence of the City and the Water Board, but also to the concurrent negligence of the driver of the automobile (Dennis Boulmay) in which they were passengers: (1) in failing to keep his vehicle under proper and reasonable control; (2) in failing to see or if he did see, in failing to heed the obstruction or defective condition in the roadway; (3) in failing to bring his automobile to a seasonable stop; (4) in failing to warn his guest passengers once the defective condition in the roadway had become apparent to him; (5) in failing to use due care and caution commensurate with the circumstances then and there existing; (6) in failing to anticipate the unusual hazard that had been allowed to remain in the roadway.
The Defendants in the main demand are the same in all cases: the City, the Water Board, and The Great American Insurance Company of New York, alleged insurers of the driver, Dennis Boulmay. Dennis Boul-may was made third-party Defendant by the City and the Water Board in all cases.
The Great American Insurance Company of New York was dismissed by the district court on a motion for summary judgment and was dismissed as a party by this Court as a result of a stipulation entered into by all parties hereto.
On the question of liability, the real issue is whether or not this protruding manhole, under the circumstances, was one which an ordinary prudent driver, travel-ling at lawful speed and properly observant, should have seen; or whether it was a concealed trap that could not be discovered until it was too late to avoid it.
The record discloses that the manhole involved was located at Fairfax Court and Aurora Drive in a shelled section of the street, the blacktopping of which stopped abruptly about 10 feet from the manhole on one side, and about 30 feet from the manhole on the other side. From the top of the manhole to the lowest point in the shelled section immediately touching the manhole was 2 inches on one side, and 2)/£ inches on the other. There were ruts on either side of the manhole caused by passing traffic.
Many witnesses testified for Plaintiff that the manhole, being black and extending *359 up from the shelled section, could he seen 200 feet away. Even if the manhole could be seen from that distance, whether it was even with or above the level of the shelled segment could not. This is because the manhole was erected at the proper level with the blacktopped road. From a distance of 200 feet it would be hard to tell that, within a segment of 20 or 30 feet from the abrupt end of the blacktopped road to the manhole, there was a shelled segment lower than the manhole. Furthermore, photographs taken by the Water Board show that though the manhole cover was iron and originally black, it was partially covered with shells from passing traffic, making it difficult to see from a distance.
Plaintiffs contend the City is liable under its obligation to keep its streets and sidewalks in reasonably safe condition for motorists and pedestrians. Plaintiffs contend the Water Board is jointly liable because it has the duty to install and keep the sewerage and drainage system in proper repair; and that both the City and Water Board employees had knowledge of this condition. The Water Board admittedly had investigated the condition of the street and manhole 17 days before the accident here and, in turn, notified the City of its findings. The City re-shelled the segment seven weeks before the accident, and, after the accident, paved the entire section, correcting the situation.
With respect to the legal duty of the Water Board, its only responsibility is to erect and maintain the sewerage and water systems of the City. There is no evidence that the manhole was improperly installed structurally, or at an improper level when it was delivered to the City. Even with knowledge of the possible danger to motorists, it had no legal duty to barricade it to warn approaching motorists. By assuming to do' this, it might have subjected itself to liability for intervening negligence if the barricade, instead of the manhole, caused damage to motorists be-cause of some defect in the barricade. Shalley v. N. O. Public Service, Inc., et al. (In re Sewerage & Water Board), 159 La. 519, 105 So. 606. The City alone had the duty to keep the street in repair.
The City’s liability results from its neglect to correct the danger after knowledge of the dangerous condition. St. Paul v. Mackenroth, 246 La. 425, 165 So.2d 273; Parker v. City of New Orleans, La.App., 1 So.2d 123.
The district judge’s conclusion with respect to the liability of the Defendants and the third-party action against the driver, Boulmay, is clearly covered in his reasons for judgment, viz:
“This Court * * * finds that the Sewerage and Water Board and the City of New Orleans both had notice of the condition of the street and the protruding manhole. It was the obligation of the City of New Orleans to maintain the street and the Sewerage and Water Board cannot be held responsible for the unsafe condition. The Court finds that the Sewerage and Water Board properly installed the manhole and maintained it at proper grade. Although it knew of the pro-trusión, it could not lower the manhole below the grade of the street and it could only notify the City of the condition. This it did through its employees.
“This Court finds that the condition of the street around the manhole was defective and constituted a dangerous condition which was in the nature of a 'trap’ to motorists who were not familiar with the condition and who had no reason to be on the lookout for such a condition. We further find that although the City had knowledge that traffic would cattse the shells to move towards the sidewalk and away from the roadway and the manhole, only one time prior to the instant accident did the City seek to correct the condition by having a grader ‘pull the shoulders up.’ Only after the instant *360 accident did the City proceed to permanently correct the situation. * *
“[The defendants] urge that the negligence of the driver, Dennis Boul-may, was the proximate cause of the accident and they advance certain probable situations which could have caused the accident * * * the evidence does not support defendants’ position or assumption. * * * ”
The district judge rendered judgment for the respective Plaintiffs and against the City alone in the amounts named, dismissing the Water Board and third-party Defendant, Boulmay, together with his alleged insurer The Great American Insurance Company of New York, the latter further dismissed by a joint stipulation of all parties. Therefore, we affirm the judgment of the district court with respect to the liability vel non of the Defendants and the third-party Defendant, as stated above.
The question of quantum will be discussed in each of the separate cases under the appropriate number.
The injuries suffered by the Plaintiff in this case were severe lacerations of the forehead, eyelid and nose which hemorrhaged to the extent that he required three pints of blood; íie.was in the operating room for three hours while his face was being stitched and remained hospitalized for four days. Plaintiff claims the scar tissue on his right eyelid is still a source of bother to him, causing a burning sensation 'and watering- of the eye. His face has permanent scars that will require plastic surgery which his physician estimated would cost from $2,000 to $2,500. The trial judge described the scars as “very, very evident to me.” The trial court allowed Plaintiff the following:
Medical, damages and hospital expenses $ 871.02
Loss of earnings for six months 2500.00
Future medical expenses (plastic surgery) 2000.00 Pain and suffering, present and future, mental anguish, permanent scars and disfigurement 5500.00
$10,871.02 TOTAL.
This quantum we consider correct with respect to personal injuries suffered by the Plaintiff. However, we are not satisfied that Plaintiff proved, by sufficient evidence, the item of $2500 for lost wages for the following reasons: Plaintiff was a painting and sheetrock subcontractor. When asked how he obtained his work, he replied:
“Well, you go out and get the plans when somebody tells you they’re going to build an apartment house, you take them home, look at them, and make a bid on them, go out and contact people, look at the plans. You give them an appraisal and if you’re all right you get it, and if you’re too high you don’t get it.”
When asked who did the estimating for him, he explained that he did it from the specifications; and when asked if he did any estimating from May 13, 1962 (date of the accident) to the day of the trial, he answered that he did some in 1962.
He answered in the negative when asked if his appearance “today” would interfere with his solicitation of business from contractors and homeowners.
After testifying that he took his men to work and then home each day; and admitting he was able to walk and get around as usual, after his three months disability, when he was asked why his men could not work without his personal supervision, he answered:
“A No. They’re too sloppy. They mess everything. You have to be right there with them. They couldn’t — you give them orders three times a day, when you start them off, at noon, and so forth. You probably could, but that’s not the way I do it. I stay right there with them. I stay there with them all day' long.
*361 "Q After the first three, months, were you able to talk to customers, prospective customers?
“A' I could, I guess, if I wanted to.
“Q You say that you had your first job in February, 1963. I think you said that?
“A Well, as far as I can remember.
“Q Well, that was the first job you got?
“A Started in an apartment house.
“Q Did you bid on any job before that time?
“A No, sir.”
When asked how he calculated his loss of $7,000 earnings from May 13, 1962, he answered:
“A Well, from ’62 to ’63, my income tax — from income tax returns.
“Q You base it on your income tax returns ?
“A That’s the only way I could base it. That’s the right way.
“Q You make the same amount of money every year ?
“A No, I don’t.
Q It varies?
“A It varies.
“Q. And why did you- arrive at the figure of $7,000.00?
“A Well, because I did, I think, almost $13,000.00 less business according to the income tax returns from one year to another.
"Q When you say $13,000.00 worth of business, what does that $13,000.00 represent, the amount of money that is'collected ?
“A No, sir.”
His income tax retags.slto;w his income for the years 196Q':thr«mgh 1963, as follows .
$2,098.36 O \0-Oh
864.12 t — I \£> Oh
6,470.87 Cm VO Oh
2,905.65 CO VO Oh
These returns indicate he earned twice as much in 1962 than in the two previous years combined. The decrease-in 1963 was not due to any infirmity'or disability, but only to his ill-founded and self-conscious fear of having prospective owners and contractors see his facial scars.
Therefore, the judgment in this case is amended to disallow the $2,500 for lost wages, reducing the amount of-, the award to $8,371.02; as thus amended'and in all other respects the judgment is affirmed.
Defendant is to pay stenographic fees, but, being a municipality, is exempt from the payment of any other costs.
Judgment amended and affirmed.