BARNETTE, Judge.
The two consolidated suits before this court on appeal are for personal injuries arising out of a single automobile-truck collision. In each suit the plaintiffs are the fathers of minor daughters who were guest passengers in an automobile owned by Robert S. Labry and driven by his minor daughter, Anita Labry, suing for special damages incurred by them on behalf of their daughters and for personal injuries sustained by their daughters as a result of a collision of the Labry automobile with a truck driven by Lionel J. Thomas. In each suit the defendants are Thomas; his employer and owner of the truck, Hoyt Manufacturing Corporation (Hoyt); and its insurer, Fireman’s Fund Insurance Company (Fireman’s Fund); and Commercial Union Insurance Company (Commercial), automobile liability insurer of Robert S. Labry.
In suit number 9504 of the Twenty-ninth Judicial District Court for the Parish of St. Charles, number 3870 on the docket of this court, judgment in accordance with a jury verdict was rendered in favor of plaintiff John Miller, individually and on behalf of his minor daughter, Deborah Ann Miller, and against defendants Lionel J. Thomas, Hoyt Manufacturing Corporation, and Fireman’s Fund Insurance Company in the amount of $64,000, and all costs and witness fees.
In suit number 9570 of the Twenty-ninth Judicial District Court for the Parish of St. Charles, number 3871 on the docket of this court, judgment in accordance with a jury verdict was rendered in favor of plaintiff William H. Weaver, Jr., individually and on behalf of his minor daughter, Nancy Ann Weaver, and against Lionel J. Thomas, Hoyt Manufacturing Corporation and Fireman’s Fund Insurance Company in the sum of $27,000, and all costs and witness fees. Both suits against defendant Commercial Union Insurance Company were dismissed. From these judgments defendants Thomas, Hoyt and Fireman’s Fund have appealed suspensively. Plaintiffs have appealed devolutively to protect whatever rights they may have against defendant Commercial.
A brief summary of the facts leading up to the time of the accident are: On the afternoon of December 9, 1965, plaintiffs’ minor daughters, Deborah Ann Miller and Nancy Ann Weaver, were guest passengers in a 1963 Mercury automobile owned by Robert S. Labry and driven by his minor daughter, Anita Labry. Other passengers in the automobile were Marilyn Lemoine and a Catholic nun, Sister Mary Albina Borne. The four young girls, all of high school age, and Sister Albina were travel *70 ing on U. S. Highway 61 (commonly known as Airline Highway) returning to the City of New Orleans following a trip to Norco, Louisiana, where the girls had addressed a group of eighth grade girls at a Catholic school. Airline Highway is a four-laned major thoroughfare running in a generally north-south direction. The highway consists of two hard surfaced lanes of travel in each direction separated by a 3-foot wide neutral ground, or median. In addition to the travel lanes, there is a shoulder lane for emergency purposes for both directions of travel.
The Labry automobile was traveling in the lane nearest the neutral ground, proceeding within the legal speed limit. At approximately 3:15 p. m., and at a point approximately 1.3 miles north of the city limits of Kenner, Louisiana, the front of the Labry automobile collided with the rear portion of a 1963 G.M.C. tractor-truck driven by Lionel J. Thomas, who was attempting a U-turn through an opening in the neutral ground. As a result of the impact, the Labry girl was killed immediately. All the other passengers except the Le-moine girl sustained personal injuries. These cases are concerned only with the damage claims resulting from injuries sustained by Miss Miller and Miss Weaver.
In accordance with instructions for specific findings on negligence, the jury rendered a special verdict finding that Lionel J. Thomas, the driver of the truck, was negligent and that his negligence was the proximate cause of the accident; that Anita Labry was not negligent in the operation of the automobile; and that neither Deborah Ann Miller nor Nancy Ann Weaver was contributorily negligent.
Lionel J. Thomas testified that immediately prior to the accident he had driven the tractor-truck from a job-site at which he was working southward to a service station on Airline Highway to buy some soft drinks and ice. After making his purchases he proceeded from the service station into the southbound emergency lane in the direction of New Orleans. His intention was to proceed to a break in the median and negotiate a U-turn to proceed northward back to the job-site. John J. Buceóla, a state trooper investigating the accident, testified that the distance from the service station to the opening in the median is 290 feet. Thomas testified:
“Q: Tell us your actions after you came out of the station until you started to make your turn?
A: Coming out from the station I looked; I seen a car coming. It was at least a half a mile or better, so I proceed on the highway to the right and I drove about 50 feet, cut back to my left with my signal light on and had my hand, and the time that I cross over the car was still at least about 700 feet from my truck. I proceed to the U-turn where I was suppose to make it; I looked back; when I stopped the car was still at least 350 to 400 some odd feet in the back of me. I stopped and I turned my wheel to the left because I was going to make a U-turn there and I couldn’t complete the turn; I just started to turn my wheel there; I had stopped and turned the wheel and I couldn’t complete my turn because there was some northbound cars coming so I had to wait until the cars go by before I could complete my turn. But, before I could even attempt to start the car hit me and which threw me at least a hundred some odd feet there with the brakes on.
Q: What speed were you traveling down the highway prior to attempting that U-turn?
A: I had about 15-20 to 25 miles but of course I’d slowed down. I was making about 20 miles an hour I guess.
Q: Did you ever put your brakes on ?
A: I had the brakes on when I was stopped.
*71 Q: You say you had your signal lights on;
A: Yes, sir, I had the signal lights and I had my hand and I was waving it up and down this way (shows) with the signal lights. The signal light was working because I could see it.
Q: Which signal lights?
A: The one on the side on the fender.”
The only witnesses to the accident other than the occupants of the vehicles were Dudley J. Harrell and Floyd Thomas Walker. Walker testified that on the afternoon of the accident he and Harrell were proceeding in his automobile southward to New Orleans on Airline Highway. He testified that shortly before the accident his automobile was passed by the Labry automobile traveling in the same direction. Due to slow moving traffic in the right lane Walker proceeded into the left lane of traffic behind the Labry car. He testified that immediately prior to the impact he was traveling approximately eight car lengths behind the Labry automobile at a speed of about 55 miles per hour. He stated that his first awareness of the tractor-truck was when he saw it “astraddle” the line dividing the two southbound traffic lanes, and. that it was moving to the left in front of the Labry automobile. He estimated that at this point the truck was approximately eight car lengths in front of the Labry car. He testified that he saw smoke coming from the tires of the Labry automobile and an instant later the impact. He veered sharply into the right lane to miss the Labry automobile and stopped his car a short distance past the point of the accident.
When asked to describe the position of the truck, Harrell testified:
“Q: Where was this truck when you first saw it?
A: It was cross the road, it was moving slowly but it was cross.
Q: When you say cross the road can you explain what you mean by that? How many lanes does the highway have at the point you were traveling in?
A: It has two lanes that you run on and it’s got one that you park on in case of trouble.
Q: When you first saw him which lane was he in?
A: When I first saw him like I said he was cross the road, he was cross on both of them. He was between the dividing line.
Q: Do I understand you that part of his truck was in the second lane or middle lane?
A: It was part in the left-hand lane and he didn’t come straight across, he come on a forty-five degree.
Q: How far were you from him when you first saw him approximately?
A: I’d say around five or six car lengths.- Like I say after we saw it we just had enough time to jerk to the right-hand lane. I can’t judge that in feet.”
He further testified:
“Q: Did you see any hand signal?
A: No, I did not.
Q: Were you in a position that you could see it had one been given? Could you have seen a hand signal had one been given?
A: Yes, I could see it.
Q: Was the truck moving at the time of the impact?
A: Yes, it was moving. It was moving slowly. I don’t know how fast it was moving but it was moving slowly.”
Neither Deborah Miller, seated in the right front seat of the Labry automobile, *72 nor Nancy Weaver, seated in the left rear seat behind the driver, could testify as to how the accident occurred. Miss Miller testified that she was speaking to someone in the back seat and her head was turned to the rear just prior to impact. Miss Weaver testified that she was conversing with the other occupants of the car and did not know what happened before the collision. Marilyn Ann Lemoine, seated in the back middle seat, testified that she too was engaged in conversation but she did see the truck. She stated:
“Q: Do you remember the position of the truck when you first saw it ? .
A: It was, I don’t remember where— it was in front of us and it was at a slight angle from the highway.
Q: Now, would you try to describe graphically, I know it’s difficult, what you mean by slight angle?
A: The highway as a straight line the truck was at no more, I estimated this the last time, no more than a 30 degree. It wasn’t a large angle from the highway. It wasn’t, you know, a striking angle. I could see the whole side but it was at an angle but it wasn’t large.”
Sister Mary Albina Borne, seated in the right back seat, testified:
“A: * * * The girls were speaking very gayly and I started to pray and I looked up to my left and saw that there was a very heavy traffic in the left lane on the other side of the neutral ground towards Baton Rouge. And then I glanced forward and as I did I saw this truck just in the road. I mean just in the, you know, highway getting ready to cross over. And, as I did see this I immediately pulled myself forward to the end of the seat grabbing on to the front seat; and when Miss Labry realized that the truck was stopped and she could see what was happening she yelled. And as she did I just pushed the girl to the side over and I put my hands on the back of Miss Labry’s shoulders and we both looked out of her window and we met the driver’s eyes — the truck driver’s eyes; saw six eyes in that mirror and that was it; that was the impact; that’s all I remember.
Q: Sister when you first saw the truck was he moving?
A: He was just, you know, on his approach across the road.
Q: He was going across the road ?
A: Yes, sir.
Q: Do you know how far you all were from him at that time?
A: No, I do not.
Q: Was it a very long period of time between when you saw him crossing the road and the moment of impact ?
A: No. But, I would have no way of telling you exactly; you know, the exact amount of time.”
The investigating officers at the scene testified that skid marks from the right rear tire of the Labry automobile measured 127 feet 4 inches from its beginning to the point of the collision. The tractor-truck came to rest 116 feet 3 inches from the point of impact. The testimony of all the witnesses is that the condition of the road was dry and that it was a clear day.
After a careful review of the evidence we reach the following conclusions: that immediately prior to the collision Thomas drove his heavy slow-moving tractor-truck from a position of safety in the right emergency lane across two high speed travel lanes into the narrow median; that the left rear portion of his vehicle was still in the left travel lane; that the traffic in the northbound travel lanes was heavy *73 and prevented Thomas from negotiating a U-turn; and that the Labry automobile could not avoid striking the truck.
It is a well-settled principle of law that a motorist who enters a favored thoroughfare must exercise caution and proceed only when he can do so with safety. Furthermore, when a highway is divided into two or more clearly marked lanes of traffic, a motorist should not move from one lane to another until he first ascertains that such movement can be made without endangering either oncoming or following traffic. Doucette v. Primeaux, 180 So.2d 866 (La.App. 3d Cir. 1965); Zurich Insurance Co. v. Grain Dealers Mutual Ins. Co., 169 So.2d 6 (La.App. 2d Cir. 1964); Reinninger v. Delta Fire & Casualty Co., 106 So.2d 746 (La.App. 1st Cir. 1958); LSA-R.S. 32:79, 32:104.
The courts of this State have also stated on numerous occasions that left turns and U-turns in motor vehicle traffic are the most dangerous maneuvers in which a motorist can indulge and that he must make sure that such a maneuver can be accomplished without danger to traffic to his left or rear. Booth v. Aetna Casualty & Surety Co., 220 So.2d 188 (La.App. 1st Cir. 1969); Employers’ Liab. Assur. Corp. v. Southern Farm Bureau Cas. Ins. Co., 191 So.2d 891 (La.App. 1st Cir. 1966); Ruple v. Travelers Indemnity Co., 129 So. 2d 240 (La.App. 2d Cir. 1961); Liddell v. New Orleans Public Service, Inc., 128 So.2d 80 (La.App. 4th Cir. 1961); Audubon Insurance Co. v. Levy, 73 So.2d 37 (La. App.Orleans 1954); LSA-R.S. 32:101, 32:-104. We find no manifest error in the special verdict of the jury that Lionel J. Thomas was negligent and that his negligence was the sole and proximate cause of the accident.
We will discuss first the quantum of damage in the Weaver case.
Miss Weaver was taken from the scene of the accident by ambulance to Ochsner Foundation Hospital and admitted for emergency treatment at 4:31 p. m. Later that evening she was seen by Dr. Gordon B. McFarland, Jr., an orthopedist. She had already received emergency treatment by other doctors on the hospital staff. Dr. McFarland testified when he first saw her she had a tube inserted in the chest cavity for “a pneumothorax,” meaning air in the chest cavity. She had a fracture of the neck of the left humerus near the shoulder. This was described as an undisplaced fracture of the humerus near the shoulder which did not need immobilization. There was a dislocation of the left elbow. Dr. McFarland, describing the elbow injury, said: “The dislocated elbow was a full dislocation of the entire forearm on the humerus so that it was moved back approximately an inch to an inch and a half, and was stuck in that position requiring manipulation under anesthesia to bring it back to its normal alignment and position.” It was immobilized with a splint to protect it from redislocating. This reduction had been done by a staff assistant before Dr. McFarland saw Miss Weaver.
Dr. McFarland, in describing the .fracture to the humerus just below the base where it joins the shoulder, said: “It was essentially not out of place but in good alignment and needed no further treatment except protection.” These were the injuries for which Miss Weaver was treated by Dr. McFarland. He did not treat her for fractured ribs and pneumothorax.
Dr. Alton Ochsner, Jr., also testified relative to Miss Weaver’s injuries and, in addition to the fracture of the humerus and dislocated elbow, said there were four fractured ribs (the 2nd, 4th, 5th and 9th) and a left pneumothorax. He said the collapse of the left lung was the result of air escaping into the chest cavity. This was revealed by X-ray examination and shortness of breath. His testimony related principally to the chest injuries.
Dr. Ochsner said the escape of air from the lung results from a cut in the lung surface which could be caused by trauma. *74 The rib fractures also were the result of trauma. He was asked to state the medical consequences of the rib and lung injuries and replied:
“A: Well, usually there’s either no [sic] or only temporary displacement of the fractured ribs and in the usual situation there’s just persistant pain until it heals. It does not usually involve the lung.
í¡í 5f«
Q: In this case the lung was involved ?
A: Yes, sir, the lung was injured.
Q: Doctor, was any procedure performed by you or under your direction to relieve the condition of the collapsed lung?
A: Yes, sir, a tube was placed between two of the ribs into the chest to withdraw the air.
* * * * * *
Q: And how does the lung rectify itself to go back into position doctor?
A: The constant suction draws the lung out to the edge of the thoracic space here and allows it to stick and seal off.
Q: Can you tell from looking at your records approximately how long this tube remained in Miss Weaver?
A: Yes, sir. The tube was removed on the 11th.
* * * *
Q: In your estimation or opinion was it painful to Nancy Ann Weaver?
A: I think the rib fractures were painful ; I don’t believe the thorax was.
Q: After the tube was removed was the lung back to normal, doctor?
A: Yes, sir.
Q : And when was Nancy Ann Weaver discharged from the hospital?
A: On December 15, 1965.”
The rib fractures required no special treatment. Dr. Ochsner said they are just allowed to heal and that “the healing takes place spontaneously.”
Miss Weaver returned to Dr. Ochsner on December 22 for an office visit at which time he found her chest was clear but she was having some pain. She returned to school after the Christmas holidays. Dr. Ochsner saw her for the last time on January 18 and reported that she was doing well. He said that rib fractures are painful and cause some limitation of movement and breathing until healed, which takes place in about six weeks. He testified that Miss Weaver had no permanent defects from the chest injuries and that injuries of the kind described cause partial disability during the period of healing, which is usually six weeks to two months.
Dr. McFarland, who treated Miss Weaver orthopedically, testified that after she was discharged from the hospital she returned for an office visit on December 22. On that date, he testified she was not having much pain; the splint fit well and she was instructed to begin exercises for her shoulder to prevent stiffness. On December 29, the splint was removed and she was allowed to begin using her elbow. He saw her next on January 6 and found that she had “regained excellent motion of her shoulder, but that her elbow was quite stiff.” She was instructed to begin active exercises. Her next visit was on January 27, by which time she had progressed to the point that she could discontinue wearing her arm sling at school, but she was instructed not to engage in physical education.
By February 12, Dr. McFarland found “excellent healing of her humeral fracture” but lacked 20 degrees of extension of the elbow. He recommended continuation of exercises. At that time he made a prog *75 nosis which was dictated into his report on February 26 “that she would have no permanent disability from her injury.” The last time he saw her professionally was April 23, 1966, “at which time she had a full range of motion of her shoulder and lacked 10 degrees extension of her elbow.” She was released on that date to resume normal physical activities. He said that her progress indicated that she would regain the full function of her arm and that there were no permanent results of the injuries.
For these injuries the jury awarded $25,000. The defendants seek a substantial reduction in this award.
We are fully cognizant of the jurisprudential guidelines set forth by the Supreme Court in several recent decisions, and particularly in Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967) ; Ballard v. National Indemnity Company, 246 La. 963, 169 So.2d 64 (1964); Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963). See also Brown v. City of Alexandria, 226 So.2d 600 (La.App. 3d Cir. 1969), and Davis v. Pena, 222 So.2d 595 (La.App. 4th Cir. 1969). We must and do accord the jury a range of “much discretion” in awarding damages in personal injury cases and are reluctant to disturb such awards on appeal. In this case, however, the award is so grossly excessive, in our opinion, that we are required to reduce it substantially.
The Supreme. Court in the above-cited cases has clearly stated that awards in similar cases are not to be followed merely for the sake of uniformity, but as guidelines to determine if there has been an abuse of the “much discretion.” With that admonition in mind, we have compared awards in other cases and have found none in which an award for similar, nonpermanent injuries comes close to $25,000. There are no two cases exactly alike, and the following are cited merely as indicative of the excessiveness of the award of $25,000 to Miss Weaver: James v. Food Town, Inc., 205 So.2d 721 (La. App. 1st Cir. 1967); Peterson v. Armstrong, 176 So.2d 453 (La.App. 3d Cir. 1965); Goss v. Armstrong, 176 So.2d 462 (La.App. 3d Cir. 1965); Mogg v. Armstrong, 176 So.2d 463 (La.App. 3d Cir. 1965); Ponselle v. Armstrong, 176 So.2d 464 (La.App. 3d Cir. 1965); Soprano v. State Farm Mutual Automobile Ins. Co., 155 So.2d 287 (La.App. 3d Cir. 1963); Theunissen v. Guidry, 151 So.2d 499 (La. App. 3d Cir. 1962); Trahan v. Palms Hospital, Inc. et al., 143 So.2d 280 (La.App. 3d Cir. 1962); Caro v. Comeaux, 142 So.2d 531 (La.App. 1st Cir. 1962); Landry v. Ostheimer, 140. So.2d 497 (La.App. 1st Cir. 1962); Zachary v. United States Fidelity & Guaranty Co., 116 So.2d 167 (La.App. 1st Cir. 1959); Pierson v. Hartford Accident and Indemnity Co., 107 So.2d 465 (La. App. 1st Cir. 1958); Bourgeois v. Fidelity & Casualty Co. of New York, 102 So.2d 532 (La.App. 1st Cir. 1958).
Miss Weaver did indeed suffer substantial pain initially, but the pain subsided as she made rapid recovery. According to Drs. Ochsner and McFarland she was fully recovered by April, 1966 (approximately four months), with no permanent effects. For the pain and suffering, it is our opinion that $7,500 would be adequate compensation) and the judgment in her favor will be reduced accordingly.
The stipulated hospital expense incurred by Mr. Weaver of $646.65 is the maximum amount of recovery to which he is entitled. The jury’s award of $2,000 for this item is further evidence of its abuse of discretion.
We will now address ourselves to the quantum of damages in the Miller case.
Miss Deborah Ann Miller was also taken by ambulance to Ochsner Foundation Hospital and was given emergency treatment by two staff associates under the direction of Dr. Alton Ochsner, Jr. Dr. Ochsner described Miss Miller’s injuries as follows:
“A: Debra had multiple facial lacerations, cuts of the face and fore *76 head. She had a soft tissue — that means no fracture of the bone; injury to the right shoulder and to the left forearm and right hip. She had no fractures of the face. She had a laceration across the forehead here which you can barely see the scar now. She had an extensive laceration that came from the front of the ears down to the corner of the mouth and the corner of the mouth was rather badly chewed up. She had another laceration that came right across the edge of the nose here up into the eyelid and extended down this way a little bit. I believe those were all of them.

A: That’s right it went up from the lip, across the nose, and up to the eyelid.

A: The lacerations to her face were cleaned and sutured and then she was admitted to — well, this was done in the operating room and then she was kept in the hospital under observation for a few days.

Q: How long did she stay in Ochsner Foundation Hospital?
A: Debbie was discharged on December 12, and she’d been admitted on December 9.”
The lacerations were cleaned and sutured under local anesthetic. Approximately 100 sutures were required. Some stitches were removed before leaving the hospital on December 12, and on December 15 the others were removed. On December 22 she returned to Dr. Ochsner, who then removed a piece of glass which had been overlooked and had worked its way to the surface inside the mouth. Dr. Ochsner saw Miss Miller several times in his office, the last being on July 20, 1966. He recommended plastic surgery to reduce the disfigurement from the scars.
Dr. Ochsner was questioned on the effect on the appearance of the facial scars from sunburn and heat from exertion. He said that the scars would “stand out” more than when the patient is at rest. This, he explained, is caused from loss of pigmentation.
Miss Miller was placed under treatment of Dr. Duncan M. McKee, a plastic surgeon who saw her initially on August 23, 1966. He described her scars as follows:
“A: It was a curved scar extending from the corner of the mouth to the anterior border of the ear on the right side and (8) centimeters curvalinear extending oblique across the forehead and right side of the forehead, a three (3) [centimeter] curvalinear scar below the eye, the right eye and a two (2) centimeter scar on the right side of the upper lip.”
When Dr. McKee testified at the trial below he had already performed the first of a three-stage surgical procedure for plastic revision. He was asked if there was any improvement and answered:
“A: It’s too early to be sure as yet. This was done last summer I believe; we won’t really know the final improvement probably until next fall.
Q: Did you have any problem with the right lower lip in the lip area?
A: Yes, as I recall the scar widened out afterwards.
Q: Widened. Is it possible that these scars will be permanent to some degree?
A: All scars are permanent.

A: The scars that she has remaining that we haven’t done anything to are on the forehead and one the left cheek; the scar adjacent to the lip has widened precipitously [sic] *77 and I think that probably we should do that over; we may very well sand the scar that we have already worked upon to smooth it out more than it is now.
* * * * * *
A: On the upper lip there is a scar; I am not sure whether we will do anything to [it] or not; it may not need it.”
He testified that he was not entirely satisfied with the result of the first operation around the mouth; that this, being a mobile area, is more difficult and the patient must cooperate fully by limiting talking, smiling, and laughing for as long as three months. He was asked if there was a possibility that the other operations would not improve the scars, and answered, “There is always that possibility.” He testified that the results would not be known fully for two years.
The last time Dr. McKee saw Miss Miller before the trial (April 2, 1968) was on November 22, 1967. He testified that the scars had changed since August, 1966 (when he first saw her), saying:
“Q: To what extent or how have they [the scars] changed?
A: They have gone through the normal process of naturalization that any scar does; in other words in plain layman’s language they are not as visible as they were.
Q: That’s correct. Is it not correct to say that they are not as visible as they were when you saw her in 8/66?
A: Yes, that’s true. Most scars reach their full maturity between about one or two years after the injury or surgery, whatever you call it. After that period they usually remain the same.
* * * * * *
Q: Is it fair to state at the time the most apparent scar on Debbie’s face is the one on her forehead?
A: I think the one around the mouth is.
* * * * * *
Q: You believe your surgery helped her in the one around her mouth?
A: Right in the middle — right in the mouth crack?
Q: Yes.
A: Oh, no.
Q: You think it diminished the appearance of the scar and/or increased it?
A: Essentially it has, right in the mouth, it might have I believe. To answer your question — (interrupted) .
Q: Is this girl disfigured?
* * * * * *
A: Yes; she has disfigurement; if I can — that depends from the normal appearance from whatever the structure of the face, she has some scars so she is disfigured; if you care to go into degree of the disfigurement — (interrupted).
Q: Would you care to estimate the degree?
A: Then again it depends — this disfigurement. I have seen many people with disfiguration and compared to it her disfiguration is minor.

A: Oh, yes. She has achieved a considerable amount of improvement already and during the next 6 months there will be even more.”
Both Miss Weaver and Miss Miller are exceptionally bright and attractive young ladies. A school photograph filed in evidence, taken three months before the accident, portrays Miss Miller as an animated girl of above average attractiveness. Photographs taken immediately following the removal of sutures showing the worst *78 of the effects of her accident indicate the extent of the facial lacerations. There were no later photographs filed in evidence, and we have only a word picture of her appearance at the time of trial.
Miss Miller was described as an active athletic type whose interest is in the field of physical education. There was testimony that the facial scars might be more noticeable after periods of exertion and exposure to sunburn which was more likely with a person of Miss Miller’s activities. We interpret the testimony of Drs. McKee and Ochsner, however, as meaning that they do not consider Miss Miller’s scars to be grossly disfiguring, but serious enough to cause an attractive young lady psychological discomfort. We agree that this is a factor which deserves much consideration.
Except for the facial scars and the physical pain associated with her injuries and the surgical procedures performed and contemplated, there is no other element for which she is entitled to recover damages. The other injuries were superficial and at most contributed in some measure to her pain for a few days following the accident. There are no disabling effects.
For these injuries the jury awarded $60,000. Our comparison of this award with other awards in cases involving similar injuries convinces us that it was a clear case of abuse of the jury’s “much discretion.”
The following cases are cited merely as illustrations and as supportive of the conclusion we have reached: Wicker v. United States Fidelity & Guaranty Insurance Co., 211 So.2d 420 (La.App. 1st Cir. 1968); Barnard v. Skains, 205 So.2d 212 (La.App. 2d Cir. 1967); Mullin v. Skains, 205 So.2d 207 (La,App.2d Cir. 1967); Talley v. Employers Mutual Liability Insurance Co., 181 So.2d 784 (La.App.4th Cir. 1966); Knotts v. Employers Casualty Company, 177 So.2d 630 (La.App.3d Cir. 1965); Castrinos v. City of New Orleans, 172 So.2d 357 (La. App.4th Cir. 1965); Alleman v. Patterson, 172 So.2d 156 (La.App.1st Cir. 1965); Fas-lund v. Kendrick, 169 So.2d 276 (La.App. 1st Cir. 1964); Bernard v. Hungerford, 157 So.2d 246 (La.App.3d Cir. 1963).
We will therefore reduce the award to Miss Miller to $25,000. In our opinion this will be adequate compensation for the injuries sustained with full consideration being given to the probable permanent facial disfigurement of some degree. This amount, in our opinion, is more in keeping with a proper exercise of judicial discretion than was the $60,000 awarded by the jury.
Mr. John Miller, Deborah’s father, offered in evidence proof of expenses in the amount of $1,230.90. To this must be added $500 to cover Dr. McKee’s surgical fees for the two contemplated surgical procedures and $500 to cover the estimated additional hospital and incidental expenses. This makes a total of $2,230.90. There is no evidence whatever in the record of other expenses past or contemplated. On this evidence the jury awarded Mr. Miller $4,000. This is further evidence of the jury’s abuse of discretion in fixing the awards in these two cases.
For the foregoing reasons, the judgment in the case of John Miller, individually and on behalf of his minor daughter, Deborah Ann Miller, number 9504 on the docket of the trial court and number 3870 on the docket of this court, is amended so as to reduce the award of damages in favor of John Miller from $4,000 to $2,230.90 and so as to reduce the award of damages on behalf of his minor daughter, Deborah Ann Miller, from $60,000 to $25,000, and as thus amended and in all other respects the same is affirmed.
The judgment in the case of William H. Weaver, Jr., individually and on behalf of his minor daughter, Nancy Ann Weaver, number 9570 on the docket of the trial court and number 3871 on the docket of this court, is amended so as to reduce the award *79 of damages in favor of William H. Weaver, Jr., from $2,000 to $646.65 and so as to reduce the award of damages on behalf of his minor daughter, Nancy Ann Weaver, from $25,000 to $7,500, and as thus amended and in all other respects the same is affirmed.
The plaintiffs Miller and Weaver are cast for the cost of the appeal only.
Judgments amended and affirmed.