MILLER, Judge.
Plaintiffs, all members of the John Brown family, were awarded damages for their personal injuries and for the wrongful death of John Brown. The injured parties were guest passengers in a Ford sedan which was traveling too fast for the iced over bridge and the prevailing heavy fog conditions. While in the inside or passing lane, the Ford rear-ended Midstate Beer Distributors’ slow moving truck and trailer after the rig had slowly proceeded from a stopped position in the outside lane to a point where the trailer was almost if not entirely in the inside or passing lane. De.fendant Travelers Insurance Company, insurer of Midstate Beer Distributors truck and trailer, appealed. We find the truck driver free from negligence and reverse.
The accident occurred at about 7:00 a. m. on February 17, 1970 on the new bridge which spans Red River between Alexandria and Eineville. The bridge is of four-lane construction, the two 15' wide northeast bound lanes which take traffic to Pineville being separated from the two 15' wide southwest bound lanes by a 12" to 14" high concrete divider. The posted speed limit on the ramp and bridge is SO miles per hour.
LSA-R.S. 32:64(A) provides:
“No person shall drive a vehicle on the highway within this state at a speed greater than is reasonable and prudent under the conditions and potential hazards then existing, having due regard for the traffic on, and the surface and width of, the highway, and the condition of the weather, * * * ”
It was established that from 5 to 10 miles per hour was the maximum safe speed on the ramp and bridge under the prevailing conditions.
The accident occurred in the inside (left) lane of the northeast bound lanes on the level portion of the bridge some few feet southwest of the southwest portion of the bridge’s steel superstructure. The ramp is level for a distance of 120 feet southwest of this steel superstructure and gradually slopes downward for an additional distance of at least 430 feet before it reaches a point where the concrete road is supported by a land fill. Exhibit Brown-1 at Tr. 63. These facts are relevant because of the impressive testimony that ice formed on the ramp wherever air circulated under the paved roadway.
At the scene of the accident there was dense fog reducing visibility to about two car lengths and the ramp surface was covered with heavy ice. There was no ice or fog on the road approaching the ramp leading to the bridge and there are many conflicting statements as to where the ice and fog began. In well considered written reasons the trial judge summarized the testimony of all witnesses, but did not make a factual determination as to where the ice *113 and fog began. We find that the evidence preponderates that the fog and ice began at least 150 feet southwest of the site of this accident. It was established that the fog was clearly visible to all motorists long before they reached the fog, and that the ice was not so visible until they reached the area iced over. There were no signs posted or any other warning that the bridge was iced over.
The City of Alexandria had dispatched one of its pickup trucks and three men to the bridge that morning to salt down the roadway. The pickup truck was heading northeast and the men were working in the fog in the right or outside northeast bound lane. They were on the level portion of the ramp or bridge at or near the southwest portion of the steel superstructure. They did not post warnings of their activity. The claim against the City was compromised during the trial. While the City truck was stopped or barely moving, Mr. Porche (not involved in this appeal) drove his Pontiac automobile into the rear end of the City truck. The Porche Pontiac and the City truck remained in the outside lane with the front of the Pontiac against the rear of the City truck.
The Midstate Beer Distributors’ truck and trailer weighed some 30,000 pounds with its load. The tractor was 10 to 12 feet long and the trailer was 30 feet long. Mr. Willis, the driver, was proceeding toward Pineville in the outside lane and was slowly following an unidentified car up the ramp. As they entered the fog bank, he turned on his headlights. He reacted to the brake lights on the car ahead and stopped behind the stopped unidentified car. He then observed that the unidentified car had stopped behind the City-Porche wreck. The unidentified car then slowly proceeded from its stopped position into the passing lane and safely passed around the City-Porche wreck and the tail lights disappeared into the fog.
Willis then looked in his left rearview mirror and seeing no overtaking headlights drove the Midstate tractor-trailer into the left lane to go around the City-Porche wreck. As the tractor was in the left lane and the trailer was partially in both lanes, the right rear of the trailer was struck by the front end of Ezra Ryland’s Chevelle stationwagon which was heading northeast and was entirely in the outside lane. The front of the Chevelle was substantially damaged, but Ryland was not seriously injured. The tractor-trailer continued to move into the left lane and when it was almost, if not entirely, in the left lane it was struck in the rear a second time, this time by the Ford sedan driven by Richard Deal and in which the Browns were guest passengers.
The Deal Ford was in the passing lane. The front end of the Ford was uniformly demolished. Exhibit Defendant-City #1, Tr. 64.
Deal had been wakened early that morning by members of the Brown family with the request that he take their sick father John Brown to a hospital. He took his car to the Brown residence where Mr. Brown was carried to the car and placed in the back seat. Deal thought Mr. Brown was suffering from a stroke or a heart attack for he was unable to communicate and had difficulty breathing. They went to sée Dr. David M. Carlton of LeCompte who examined Mr. Brown in the car and immediately wrote an admission slip to Charity Hospital in Pineville. Dr. Carlton was of the opinion that the 75 year old patient was suffering from heart failure.
Deal testified that he was driving only 20 miles per hour when he reached the top of the bridge (some 120 feet southwest of the superstructure) and indicated that he slowed his speed because of the fog. He did not see ice on the road. The trial court found that 20 miles per hour was excessive under the circumstances, and we agree. Furthermore, we agree with the trial court’s finding that the extensive damages to the front of Deal’s vehicle and the extensive injuries to Deal and the Browns *114 “support a conclusion that the Deal vehicle must have been going at an excessive rate of speed when the brakes of that vehicle were applied.”
Ryland testified in a pre-trial deposition that he saw the headlights of the Deal vehicle, “ * * * and they were coming. That car was really rolling. The car was really driving. I mean the man seemed like was going at least fifty miles a hour. Going awful fast.” (Deposition page 6, Tr. 64.) Ryland also testified that the truck and trailer were more over in the left lane and moving slowly at the time Ryland hit the right rear end of the trailer. (Deposition page 9.) He estimated that five or six seconds passed after his accident before the real accident, and that “By the time the (Deal) car hit it, it was pretty near all the way over. The back end was. The front end was already over.” (Deposition page 10.) At trial Ryland reduced his estimate of Deal’s speed, but the physical evidence supports his original testimony.
The truck did not reach a speed of over three miles per hour during the attempt to go around the City-Porche wreck. This was almost the maximum safe speed according to the investigating officers. These officers stated the conclusion that it was unsafe for the truck to attempt to pass under the conditions but did not explain why. That it was unsafe to remain where the Midway truck had stopped was established by the fact that Ryland ran into the trailer while it was moving forward and leaving the outside lane. Some time after these accidents, there was a fourth accident further down the ramp (southwest of this accident scene) when another car rear-ended a stopped vehicle in the outside lane.
The trial court found “ * * * the driver of the Midstate tractor-trailer was negligent when he moved from the right to left lane at a time when he could not or did not ascertain that such movement could be made in safety without endangering following traffic. R.S. 32:104(A) provides that no person shall turn a vehicle or move it to the right or to the left on a roadway unless such movement can be made with reasonable safety. The jurisprudence appears to be settled that one who wishes to change lanes on a multiple lane highway is obligated to ascertain that such a change may be made safely and without interfering with overtaking traffic. Miller v. Thomas, [La.App.], 234 So.2d 67; Blanchard v. Hardware Mutual Casualty Co., [La.App.], 153 So.2d 517; Barber v. Thompson-Hayward Chemical Company, [La.App.], 152 So.2d 649; Byrnes v. Bostick, [La.App.], 214 So.2d 179; Bridges v. Wm. T. Burton Industries, Inc., [La.App.], 193 So.2d 886 (3rd Cir.).”
We distinguish these cases. The overtaking motorists were not speeding and visibility was not obscured. Furthermore, where the lane changer was found negligent, the lane changes were made suddenly after the overtaking motorist saw that the lane was open before he was commited to pass the lead vehicle.
Here the truck driver did not make a sudden lane change at a time when the overtaking driver saw a clear lane ahead. The truck’s passing maneuver was well underway and the truck and trailer was moving forward at close to the maximum safe speed in the passing lane before Deal first saw the “big red truck”. If Deal had been traveling at the maximum safe speed he could have stopped before rear-ending the trailer which was traveling in the passing lane at almost the maximum safe speed before Deal reached a point where he could first see the trailer.
On a multiple lane street or highway, a greater burden of responsibility for the exercise of extreme caution is required of a motorist changing from one lane to another than of a motorist proceeding within lawful speed limits in a straight line in a marked lane. This does not, of course, relieve the motorist traveling straight of the duty of care; of keeping a''proper lookout; of having his vehicle under control *115 and the duty to avoid all foreseeable danger, but the greater responsibility is imposed upon the one who deviates from his course and moves across parallel traffic lanes. Canzoneri v. Connecticut Fire Insurance Co. of Hartford, 163 So.2d 834, 838 (La.App. 4 Cir. 1964); Bridges v. Wm. T. Burton Industries, Inc., 193 So.2d 886, 889 (LaApp. 3 Cir. 1967).
Travelers has carried the burden of proof to show that the driver of the Midstate truck and trailer complied with LSA-R.S. 32:79(1). At the time the lane change was undertaken, the movement could be and was safely made. The lane changer did not have to defer his right to use the open passing lane reserved for northeast bound traffic, because of the possibility that some overtaking motorist would enter the area of obscured visibility at some three to five times the lawful speed under the prevailing circumstances.
The trial court found that the fact that the truck and trailer may have reached the passing lane before being rear ended did not convert the case from an “inopportune change of lanes” case to a rear end collision case, citing Anthony v. State Farm Mutual Insurance Co., 227 So.2d 180 (La.App. 2 Cir. 1969) and Jefferson v. Strickland, 242 So.2d 582 (La.App. 1 Cir. 1970). Neither case was concerned with obscured visibility or a speeding overtaking motorist. In Anthony, the court found that the lane change was made at a time when the overtaking vehicle had neither time nor opportunity to take evasive action. In Jefferson, the lane change was made when the overtaking motorist was 60 feet away and when the overtaking motorist could not avoid the accident. There was no suggestion in either case that the lane change was made (or almost completed) before the overtaking motorist could see the lane changer.
Failing to find negligence on the part of the driver of the Midstate truck, the judgment in favor of plaintiffs is reversed and set aside. Plaintiffs’ suit is dismissed. Costs both at trial and on appeal are assessed to plaintiffs-appellees.
Reversed and rendered.